1  Teresa S. Renaker, Cal. Bar. No. 187800
   teresa@renakerscott.com
2  Kirsten G. Scott, Cal. Bar. No. 253464
   kirsten@renakerscott.com
3  RENAKER SCOTT LLP
   505 Montgomery Street, Suite 1125
4  San Francisco, California 94111
   Telephone: (415) 653-1733
5  Facsimile: (415) 727-5079

6  Wendy Stryker (*pro hac vice application pending*)
   wstryker@fkks.com
7  Kristen Niven (*pro hac vice application pending*)
   kniven@fkks.com
8  FRANKFURT KURNIT KLEIN + SELZ PC
   28 Liberty Street, 35th Floor
9  New York, NY 10005
   Telephone: (212) 980-0120
10 Facsimile: (212) 593-9175

11 Attorneys for Plaintiffs

12                **UNITED STATES DISTRICT COURT**

13              **NORTHERN DISTRICT OF CALIFORNIA**

14                 **SAN FRANCISCO DIVISION**

| | |
|---|---|
| 15  SARAH PERSONETTE, JAMES SULLIVAN, and DALANA BRAND, | Case No. 3:24-cv-6266 |
| 16 | **COMPLAINT FOR BREACH OF CONTRACT, AND FOR SEVERANCE BENEFITS AND EQUITABLE RELIEF** |
| 17       Plaintiffs, | |
| 18       v. | |
| 19  ELON MUSK; X CORP., f/k/a TWITTER, INC.; TWITTER, INC. | **DEMAND FOR JURY TRIAL AS TO NON-ERISA CLAIMS** |
| 20  CHANGE OF CONTROL AND INVOLUNTARY TERMINATION PROTECTION POLICY; and DOES 1-20, inclusive, | |
| 21 | |
| 22       Defendants. | |
| 23 | |

24

25

26

27

28

**INTRODUCTION**

1.     The dramatic acquisition of Twitter, Inc. (subsequently Defendant X Corp., hereinafter "Twitter" or the "Company") by Defendant Elon Musk ("Mr. Musk") in 2022 and the ensuing legal battles have been widely publicized. Here, Plaintiffs are three additional executives at Twitter who relied on the existence of their severance benefits to stay at Twitter and to help guide the Company through the tumultuous events of the acquisition in order to ensure that operations and transition were as smooth as possible, fulfilling their duties to the Company, the shareholders, the buyers and the many employees they supervised.

2.     Once it became clear that their duties would be materially and irreversibly changed upon the conclusion of the acquisition, each Plaintiff tendered their resignation for "Good Reason" in a manner designed to be as cooperative as possible.

3.     As in other similar cases, however, Elon Musk and Twitter did not welcome Plaintiffs' assistance, but instead engaged in ongoing bad faith and deceptive tactics to refuse to pay Plaintiffs and other executives the benefits to which they are entitled, and which Mr. Musk knew would be due to them upon a "Change of Control" event such as his purchase of the Company.

4.     Specifically, Mr. Musk and Twitter abruptly shut Plaintiffs out of the Twitter offices and computer systems, insisted that until a certain date they remained employees who needed to participate in an internal investigation while not paying them or treating them like employees, and strung them along with promises of providing their separation benefits until abruptly, hours before the end of their notice period on the Sunday evening of Thanksgiving weekend, he terminated them "for Cause" while not specifying a single piece of evidence demonstrating such "Cause."

5.     Musk then appointed his agents (including employees from his companies) to deny the severance claims that Ms. Personette, Mr. Sullivan, and Ms.

Brand filed as part of the severance benefit administrative process.

6.     Plaintiffs have not engaged in any misconduct or done anything which could be considered "Cause" for termination.  Rather, any stated bases for termination, which have continued to shift and change throughout the claims process, were manufactured in bad faith to evade claims by Plaintiffs and other executives whom Musk had terminated specifically to deny them severance plan benefits.[1]

7.     Plaintiffs bring this action for wrongful denial of severance benefits under Section 502(a)(1)(b) of the Employee Retirement Income Security Act of 1974, as amended ("ERISA"). In addition, because Musk fired each Plaintiff to interfere with their right to benefits, each Plaintiff also brings claim for interference with protected rights in violation of ERISA Section 510, as well as other related claims to enforce their right to receive benefits under ERISA Section 502(a) and for breach of contract under the Twitter, Inc. 2013 Equity Incentive Plan Restricted Stock Unit Agreements.

## **PARTIES**

8.     Plaintiff Sarah Personette ("Ms. Personette") was an employee of Twitter from October 1, 2018 until November 27, 2022.  Ms. Personette joined Twitter as the Company's Vice President, Head of Global TCS, based in the Company's New York, New York office.  From July 1, 2021, Ms. Personette was promoted to Chief Customer Officer leading the Customers organization.  In her position as Chief Customer Officer, Ms. Personette reported to the CEO of the Company.  Ms. Personette at all relevant times resided in Fair Haven, New Jersey and worked in New York, New York.  Ms. Personette is a participant, as defined by ERISA § 3(7), 29 U.S.C. § 1002(7), in the Twitter, Inc. Change of Control and

---

[1] Each Plaintiff is entitled to severance benefits including twelve months of base salary and COBRA premiums, plus 50% of their unvested Restricted Stock Units.

Frankfurt Kurnit Klein + Selz pc

1  Involuntary Termination Protection Policy, as amended and restated effective

2  August 8, 2014 and related Participation Agreement(s) (the "Plan").[2]

3       9.     Plaintiff James Sullivan ("Mr. Sullivan") was an employee of Twitter

4  from on or about November 8, 2021 until November 27, 2022.  Mr. Sullivan was

5  initially hired as "VP, Product" and was based in the Company's San Francisco,

6  California office.  He was promoted effective May 1, 2022 to General Manager,

7  Bluebird.  In his position as General Manager, Bluebird, Mr. Sullivan reported to the

8  CEO of the Company.  Mr. Sullivan also served as interim General Manager of

9  "Goldbird," Twitter's revenue products.  Mr. Sullivan at all relevant times was a

10  resident of Oakland, California and worked in San Francisco, California. Mr.

11  Sullivan is a participant, as defined by ERISA § 3(7), 29 U.S.C. § 1002(7), in the

12  Plan.

13       10.    Plaintiff Dalana Brand ("Ms. Brand") was an employee of the

14  Company from on or about July 12, 2018 until November 27, 2022. Ms. Brand was

15  originally hired as VP, Total Rewards, and was promoted effective December 31,

16  2021 to Chief Human Resources Officer and Head of Inclusion and Diversity

17  ("CHRO"). In her position as CHRO, Ms. Brand reported to the CEO of the

18  Company. Ms. Brand at all relevant times was a resident of Clayton, California and

19  worked in San Francisco, California.  Ms. Brand currently resides in New York,

20  New York. Ms. Brand is a participant, as defined by ERISA § 3(7), 29 U.S.C. §

21  1002(7), in the Plan.

22       11.    Defendant Elon Musk is the Chairman, Sole Director, Chief

23  Technology Officer, and controlling shareholder of Defendant X Corp., the entity

24  into which he merged Twitter, Inc. in April 2023. At all times relevant to the

25  Complaint, Mr. Musk was and/or is the CEO of X Corp.

26

27  [2] A copies of the Plan and Participation Agreements as applicable to each Plaintiff

28  are attached as Exhibits A, B and C.

Case No. 3:24-cv-6266

12.    Defendant X Corp. is a Nevada corporation with its headquarters in San Francisco, California and is the successor in interest to Twitter, Inc., a Delaware corporation headquartered in San Francisco, California.  X Corp. succeeded to all of Twitter's obligations upon the October, 27, 2022 closing of the merger transaction, including Twitter's obligations under the Plan.  X Corp. is the Plan Sponsor and funding source of the Plan.

13.    Upon Mr. Musk's acquisition of Twitter, there was and continues to be such unity of interest and ownership between Twitter and Mr. Musk that there is no longer a separate corporate status among Mr. Musk, Twitter, and Twitter's successor X Corp.  Mr. Musk controls Twitter's decision making and operations and disregards corporate formalities in conducting Twitter's operations based on his personal whims and/or polls conducted from his personal Twitter account.

14.    Mr. Musk often employs and relies on Excession, LLC ("Excession"), his personal family office, and Excession employees to conduct X Corp. business.  Mr. Musk also relies on personal friends, family members, and longtime business associates and investors to provide services to Twitter.  On information and belief, Mr. Musk brought in family members to work at Twitter.

15.    Mr. Musk has commingled assets of his other companies with Twitter.  On information and belief, Mr. Musk has allowed Twitter's assets to be used by his other companies, including Tesla and xAI.  Additionally, Mr. Musk regularly uses employees of his other companies to conduct Twitter business on his behalf and has granted them access to Twitter's systems and records.  For instance, as the Delaware Court of Chancery found, Mr. Musk enlisted approximately fifty Tesla engineers to provide services to Twitter following the acquisition, none of whom were hired, retained, or paid by Twitter for services they provided to Twitter.  xAI employees also reportedly have been working out of Twitter's headquarters.

16.    It would be inequitable and unjust to prevent Plaintiffs from recovering other remedies from Mr. Musk, who is personally responsible for and will

1    individually benefit from the acts of Twitter and entities controlled by him.

2        17.    The Plan is an employee welfare benefit plan as defined by ERISA §

3    3(1), 29 U.S.C. § 1002(1) because it is a plan, fund, or program that was established

4    or maintained by an employer, Twitter, for the purpose of providing its participants

5    with severance benefits.

6        18.    The true names and capacities of Defendants named herein as Does 1

7    through 20, whether individual, corporate, associate or otherwise, and the true

8    involvement of Defendants sued herein as Does 1 through 20, are unknown to

9    Plaintiffs, who therefore sue said Defendants by such fictitious names.  Plaintiffs

10   will amend this Complaint to show the true names, capacities, and involvement of

11   Does 1 through 20 when ascertained.  Plaintiffs are informed and believe and

12   thereon alleges that each of the Defendants designated as a "Doe" is responsible in

13   some manner for the events and happenings referred to herein, and that Plaintiffs'

14   injuries and damages as hereinafter set forth were proximately caused by said

15   Defendants.

16       19.    Plaintiffs are informed and believe and thereon allege that each of the

17   Defendants named as Does 1 through 20 is or was the agent, employee, partner

18   and/or representative of one or more of the remaining Defendants, and each of them

19   was at all times acting within the purpose and scope of such agency and

20   employment, except as otherwise provided by the Plan.  Upon further information

21   and belief, each of the Defendants herein gave consent to, ratified, and authorized

22   the acts alleged herein to each of the remaining Defendants.

23              **JURISDICTION, VENUE, and DIVISIONAL ASSIGNMENT**

24       20.    This Court has subject matter jurisdiction over Plaintiffs' claims

25   pursuant to ERISA § 502(e) and (f), 29 U.S.C. § 1332(e) and (f), and 28 U.S.C. §

26   1331.  Additionally, this Court has subject matter jurisdiction pursuant to 28 U.S.C.

27   § 1332(a) because the parties are citizens of different states.  The amount in

28   controversy exceeds $75,000 exclusive of interest and costs.

21.     Venue lies in the Northern District of California pursuant to ERISA § 502(e)(2), 29 U.S.C. § 1132(e)(2), because the subject Plan is administered in part in this District, some of the breaches alleged took place in this District, and because one or more Defendants can be found in this District.  Venue is also proper pursuant to 28 U.S.C. § 1391(b), because a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred within this District.  Finally, Paragraph 24 of Plaintiffs' Award Agreements with Twitter, under which each of their breach of contract and breach of the implied covenant of good faith and fair dealing claims arise, contain the following contractual venue provision, selecting the Northern District of California as a venue for resolving litigation of disputes arising under the Award Agreements:

> This Award Agreement will be governed by the laws of Delaware without giving effect to the conflict of law principles thereof. For purposes of litigating any dispute that arises under this Award of Restricted Stock Units or this Award Agreement, the parties hereby submit to and consent to the jurisdiction of the State of California, and agree that such litigation will be conducted in the courts of the County of San Francisco, California, or the federal courts for the United States for the Northern District of California, and no other courts, where this Award of Restricted Stock Units is made and/or to be performed. (Exhibit 2, ¶ 24.)

22.     This action should be assigned to the San Francisco Division or the Oakland Division because the subject employee benefit plan is administered in part in San Francisco County, and a substantial part of the events or omissions that give rise to the claims occurred in San Francisco County, including in that Plaintiffs Sullivan and Brand were employed in San Francisco County.

## FACTUAL BACKGROUND

**A.     Plaintiffs' Employment and Plan Participation at Twitter**

**(i)     Sarah Personette**

23.     Ms. Personette was originally hired by the Company effective October 8, 2018, as VP, Head of Global TCS.  She was promoted to Chief Customer Officer ("CCO") effective July 1, 2021.  As CCO, Ms. Personette became a member of

"Staff," which at Twitter referred to the class of executives who reported directly to Twitter's Chief Executive Officer. Her responsibilities as CCO included managing client relationships and revenue growth.

24.    As a part of her October 2018 offer letter, Ms. Personette was awarded "New Hire" Restricted Stock Units ("RSUs") subject to the terms of the 2013 Equity Incentive Plan (the "2013 Plan").

25.    Ms. Personette was granted additional equity awards in 2019, 2020, 2021, and 2022 with associated agreements that were made under the 2013 Plan.

26.    On May 12, 2022, in connection with her July 21, 2021 promotion to CCO, Ms. Personette executed a Participation Agreement to participate in the Plan as an "Eligible Employee."  Upon information and belief, the approval of Ms. Personette's participation in the Plan was consistent with prior practice (i.e. that members of Staff were approved for participation) and in the ordinary course of business.

27.    The Plan, including the Participation Agreement, entitled Ms. Personette to receive certain benefits, including "Severance Benefits" if her employment ended as a result of Involuntary Termination (defined to include resignation for "Good Reason") during a Change of Control Period.

28.    Ms. Personette was consistently recognized for her excellent performance throughout her employment, including receiving an Impact Award during the Q1 2022 planning cycle, an additional compensation award and recognition reserved for top-performing employees.

29.    During the course of her employment at Twitter, Ms. Personette never received any material negative feedback, was never advised she had failed to follow company policies or rules, and was never advised that she had engaged in gross negligence or willful misconduct.

**(ii)    Jay Sullivan**

30.    Mr. Sullivan was originally hired by the Company effective November

8, 2021, as "VP, Product." He was promoted to General Manager, Bluebird, effective May 1, 2022. As GM for the Bluebird team, Mr. Sullivan became a member of "Staff" and reported directly to Twitter's Chief Executive Officer. His responsibilities included leading the design and engineering of Twitter's consumer-facing product.

31. As a part of his September 2021 offer letter, Mr. Sullivan was awarded "New Hire" Restricted Stock Units ("RSUs") subject to the terms of the 2013 Equity Incentive Plan (the "2013 Plan").

32. Mr. Sullivan was granted additional equity awards in 2022 with associated agreements that were made under the 2013 Plan.

33. On May 21, 2022, in connection with his May 1, 2022 promotion to GM, Bluebird, Mr. Sullivan also executed a Participation Agreement to participate in the Plan as an "Eligible Employee," entitling Mr. Sullivan to receive certain benefits, including Severance Benefits, if his employment ended as a result of Involuntary Termination during a Change of Control Period. Upon information and belief, the approval of Mr. Sullivan's participation in the Plan was consistent with prior practice (i.e. that members of Staff were approved for participation) and in the ordinary course of business.

34. During the course of his employment at Twitter, Mr. Sullivan never received any material negative feedback, was never advised he had failed to follow company policies or rules, and was never advised that he had engaged in gross negligence or willful misconduct.

**(iii)   Dalana Brand**

35. Ms. Brand was originally hired by the Company on or about July 12, 2018, as VP, Total Rewards. She was promoted to Chief Human Resources Officer and Head of Inclusion & Diversity ("CHRO") effective December 31, 2021. As CHRO, Ms. Brand became a member of "Staff" and reported directly to Twitter's Chief Executive Officer. Her responsibilities as CHRO included overseeing all

aspects of human resources, including talent acquisition and management, organization development, diversity, equity, and inclusion, compensation and benefits, employee relations, and compliance.

36.    As a part of her July 2018 offer letter, and September 11, 2020 modification of the offer letter, Ms. Brand was awarded "New Hire" RSUs subject to the terms of the 2013 Plan.

37.    Ms. Brand was granted additional equity awards in 2018, 2019, 2020, 2021, and 2022 with associated agreements that were made under the 2013 Plan.

38.    On May 25, 2022, in connection with her promotion to CHRO, Ms. Brand also executed a Participation Agreement to participate in the Plan as an "Eligible Employee," entitling Ms. Brand to receive certain benefits, including Severance Benefits, if her employment ended as a result of Involuntary Termination during a Change of Control Period. Upon information and belief, the approval of Ms. Brand's participation in the Plan was consistent with prior practice (i.e. that members of Staff were approved for participation) and in the ordinary course of business.

39.    During the course of her employment at Twitter, Ms. Brand never received any material negative feedback, was never advised she had failed to follow company policies or rules, and was never advised that she had engaged in gross negligence or willful misconduct.

**B.    The Terms of the Plan and Plaintiffs' Participation Agreements**

40.    The Plan provides that participants are eligible to receive "Severance Benefits" as follows:

> As an Eligible Employee for Change of Control Severance Benefits, you will be eligible for severance benefits under this Policy if: (1) during the Change of Control Period (as defined below) and (2) your employment with Twitter of any of its subsidiaries terminates as a result of an Involuntary Termination (a "COC Qualified Termination"). If your employment with Twitter or any of its subsidiaries terminates as a result of a COC Qualified Termination, you will be eligible to receive the applicable Equity Vesting, Cash Severance and COBRA Benefit described herein and specified on your Participation Agreement.

Frankfurt Kurnit Klein+Selz PC

41.     The Plan defines "Involuntary Termination" as "a termination of employment by the Company other than for Cause, death or Disability or a termination of employment by [Ms. Personette, Mr. Sullivan, or Ms. Brand, as applicable] for Good Reason."

42.     The Plan defines "Good Reason" for a participant terminating their employment, in relevant part, as follows:

> [Y]our termination of employment within thirty (30) days following the "notice and cure period" in the next paragraph following the occurrence of one or more of the following events, without your express written consent: (a) a material adverse change in the nature or scope of your authority powers, functions, duties, responsibilities, or reporting relationship (including ceasing to directly report to the chief executive office or board of directors of a publicly traded entity . . . ).

43.     The Plan defines "Cause" for a participant terminating their employment, as follows:

> (a) your unauthorized use or disclosure of the Company's confidential information or trade secrets, which use or disclosure causes material harm to the Company; (b) your breach of any agreement between you and the Company; (c) your failure to comply with the Company's written policies or rules, including its code of conduct; (d) your conviction of, or plea of "guilty" or "no contest" to, a felony under the laws of the United States or any state thereof; (e) your gross negligence or willful misconduct in the performance of your duties; (f) your continuing failure to perform assigned duties after receiving written notification of the failure from the Board (or for Eligible Employees other than the Chief Executive Officer, from the Chief Executive Officer); or (g) your failure to cooperate in good faith with a governmental or internal investigation of the Company or its directors, officers or employees, if the Company has requested your cooperation; provided, however, that "Cause" will not be deemed to exist in the event of subsections (b), (c) or (f) above unless you have been provided with (i) 30 days' written notice by the Board or the act or omission constituting "Cause" and (ii) 30 days' opportunity to cure such act or omission, if capable of cure.

44.     Under the Plan and her Participation Agreement, Ms. Personette is entitled to accelerated vesting of 50% of her then-unvested equity, one year of base salary, and one year of COBRA benefits if she experiences a COC Qualified Termination, whether a resignation for Good Reason or a termination by the Company other than for Cause, amounting to approximately $17,605,625.30.

45.     Under the Plan and his Participation Agreement, Mr. Sullivan is

entitled to accelerated vesting of 50% of his then-unvested equity, one year of base salary, and one year of COBRA benefits if he experiences a COC Qualified Termination, whether a resignation for Good Reason or a termination by the Company other than for Cause, amounting to approximately $21,785,500.30.

46.    Under the Plan and her Participation Agreement, Ms. Brand is entitled to accelerated vesting of 50% of her then-unvested equity, one year of base salary, and one year of COBRA benefits if she experiences a COC Qualified Termination, whether a resignation for Good Reason or a termination by the Company other than for Cause, amounting to approximately $13,965,359.00.

C.    **Exhaustion of Administrative Remedies**

47.    In letters to Ms. Personette, Mr. Sullivan, and Ms. Brand dated April 11, 2023, Lindsay Chapman identified herself as the Administrator of the Plan, asserting that she had been appointed as the Administrator on January 31, 2023. However, in response to Plaintiffs' requests, no document memorializing a delegation of fiduciary authority to Ms. Chapman was provided.  Chapman, whose LinkedIn profile identifies her as a Senior Director of Human Resources at SpaceX, one of Mr. Musk's other companies, also purports to be a member of the Twitter Severance Administration Committee ("Committee"), which purportedly decided the administrative appeals that Plaintiffs each submitted in response to Ms. Chapman's denial of their Claims. The Plan does not confer any authority on the Committee and does not recognize the existence of the Committee.

48.    The Committee is purportedly composed of members including employees or executives at other companies owned by Mr. Musk.  For example, Brian Bjelte, who is Vice President of Human Resources at SpaceX, and ostensibly the person to whom Ms. Chapman reports at SpaceX, purports to be a member of the Committee. Dhruv Batura also purports to be a member of the Committee. On information and belief, Mr. Batura is or was at relevant times a Senior Director of Finance at X Corp., having previously worked for Mr. Musk for ten years at Tesla,

Frankfurt Kurnit Klein+Selz PC

Inc., another company owned by Mr. Musk.

49.     Each of the Plaintiffs exhausted their administrative remedies under the Plan even though as explained below, the purported Administrator and Committee were not authorized by the Plan to decide claims and deprived Plaintiffs of any neutral or meaningful review in the administrative process.

50.     Pursuant to ERISA § 503, 29 U.S.C. § 1133, and the Department of Labor regulations thereunder, Plaintiffs submitted claims for benefits under the Plan by letters dated December 16, 2022.

51.     By letters dated June 14, 2023, Ms. Chapman denied the claims.

52.     By letters dated November 7, 2023, Plaintiffs appealed the claim denials.

53.     By letters dated March 6, 2024, the "Twitter Severance Administration Committee," an entity not provided for by the Plan terms, denied Plaintiffs' appeals.

**D.     Elon Musk's Takeover of Twitter Created a Material Adverse Change in Plaintiffs' Positions as Defined in the Plan**

54.     Starting in January 2022, Defendant Musk began accumulating significant amounts of Twitter common stock. By the time he disclosed his holdings in a public report on April 4, 2022, as required under the Securities Exchange Act of 1934 for purchasers of more than 5% of a public company's stock, Mr. Musk already owned over a nine percent ownership stake in Twitter.  Although Mr. Musk claimed to be a passive investor in his disclosure and accepted a position on Twitter's Board of Directors the next day, by April 9, 2022, Mr. Musk notified the company that he would instead be making an offer to acquire Twitter on April 13, 2022.

55.     Mr. Musk offered to purchase the company at a price of $54.20 per share, which was a 38% premium over the stock's closing price on the day before his investment was disclosed.

56.     On April 14, 2022, Twitter's Board created a Transactions Committee

1    comprised of three highly qualified independent directors to assist and advise the

2    Twitter Board in its consideration of Mr. Musk's acquisition proposal.

3         57.    None of the Plaintiffs were members of the Transactions Committee or

4    of any committee involved in the sale transaction with Elon Musk and were not

5    invited to participate in regular Board or committee meetings around the transaction.

6    Plaintiffs played no significant role in the strategy with respect to sale of the

7    Company.

8         58.    After reviewing the offer and considering alternatives, Twitter's Board

9    ultimately accepted Mr. Musk's offer to purchase the company, and the Merger

10   Agreement was signed on April 25, 2022.

11        59.    Less than two weeks after the Twitter Board accepted Mr. Musk's

12   offer, he began attempting to back out of the deal.  On May 13, 2022, Mr. Musk

13   tweeted that the deal was "temporarily on hold pending details supporting

14   calculation that spam/fake accounts do indeed represent less than 5% of users." This

15   came as a surprise to the Company leadership and shareholders.  Mr. Musk

16   continued to maintain that he was not bound to go through with the acquisition,

17   finally delivering a notice to Twitter on July 8, 2022, purporting to terminate the

18   Merger Agreement.

19        60.    Twitter filed a lawsuit against Mr. Musk in the Delaware Court of

20   Chancery to enforce the Merger Agreement.  After months of intense, fast-paced

21   litigation, days before trial, and on the eve of Mr. Musk's deposition, he abruptly

22   capitulated and agreed to complete the acquisition on the original terms of the

23   Merger Agreement. The deal closed on October 27, 2022.

24        61.    During the intense and volatile period of the acquisition litigation,

25   between mid-May and late October of 2022, there was enormous uncertainty both

26   within the Company and as reflected in Twitter's stock price, as to whether the deal

27   would close and on what terms. Many employees left the Company during this

28   tumultuous period. Plaintiffs and other executives worked diligently to continue to

operate the business responsibly and in a manner consistent the Merger Agreement and their obligations to the Twitter Board and shareholders, including by working to retain key employees in order to continue operations and ease the eventual transition of the Company following the acquisition.

62.     As the acquisition closing drew near, Mr. Musk became aware that several executives would be entitled to payments under the Plan and similar severance benefit plans. As has been publicly reported, he then accelerated the closing of the deal, cut off the email access of multiple top executives, including former CEO Parag Agrawal, and concocted false "cause" justifications to terminate them before they could tender their resignations and claim their severance benefits, all in an improper attempt to avoid making the required payments under the Plan.

63.     As he took over the day-to-day operations, Mr. Musk issued various draconian mandates to Twitter employees, including that they should resign unless they were willing to "work[] long hours at high intensity" and "be extremely hardcore." He tweeted that employees who were working remotely would be required to return to in person work. Hundreds more employees resigned, further threatening the stability of the Company, and making Plaintiffs' attempt to continue operations and smooth the transition process even more difficult.

**E.      Plaintiffs Resigned for Good Reason**

64.     Under the express terms of the Plan, a Change of Control Period commenced on October 27, 2022, when Mr. Musk and his companies closed on their acquisition of Twitter.  At that moment, Twitter stopped being a publicly traded entity and became privately held.

65.     In addition, Mr. Musk's acquisition of Twitter constituted a "material adverse change" to each of Plaintiffs' positions as defined under the Plan, because, as of the date of the closing, they no longer reported to the CEO or Board of a publicly traded company.

66.     Accordingly, each of the Plaintiffs had "Good Reason" to terminate

Frankfurt Kurnit Klein+Selz PC

their employment with Twitter.  After careful consideration, Plaintiffs decided to serve notice of their resignation for "Good Reason" under the Plan, triggering the 30-day notice and cure period under the Plan, and entitling them to their severance benefits under the Plan at the expiration of that period, since Twitter's acquisition and conversion to a privately held company made curing the material adverse change by the end of the 30 days impossible.

67.    The day after the acquisition closed, on October 28, 2022, each of the Plaintiffs submitted a notice to Twitter that he or she was resigning from employment at Twitter and specifically asserting that he or she had "Good Reason" as defined under the Plan to terminate his or her employment, since Twitter was no longer a publicly traded company, which constituted a "material adverse change" under the Plan.

68.    Although each Plaintiff recognized that Twitter could not conceivably cure the "material adverse change" underlying the Good Reason in light of the acquisition, they each reiterated their willingness, on a voluntary basis, to remain employed for a mutually agreeable period to allow for a smooth transition of their responsibilities.

69.    Neither Mr. Musk nor anyone else at the Company acknowledged receipt of these resignation notices, nor did they engage Plaintiffs' assistance in transitioning their work to new management.

**F.    Twitter's Requests for Participation in a Purported Internal Investigation, Counterproductive Shut Out, and Purported Termination of Plaintiffs**

70.    On October 29, 2022, Mr. Musk sent Ms. Personette and Ms. Brand each a letter requesting that they provide documents that might be in their possession and asked to schedule a time for each to be interviewed by counsel in connection with a pending investigation into "a number of subjects" in which the only subject specified was the termination of and payments to a former employee following his termination (the "October 29 Letters").

71.     The former employee referenced, a Mr. Zatko, was not on Ms. Personette's or Ms. Brand's team, and they had no managerial purview over him.

72.     The October 29 Letters advised Ms. Personette and Ms. Brand that Twitter believed they may have relevant information regarding some or all of these subjects and presumed that each continued to be a Twitter employee, stating "we will assume your availability during working hours."

73.     The October 29 Letters also explicitly stated that "no one has accused you personally of any wrongdoing, the Company just wants to learn the information you have." Both Plaintiffs expressed their willingness to participate in the investigation.

74.     However, on October 31, 2022, Twitter abruptly shut all three Plaintiffs out of the office and removed their access to all Twitter systems, including email, calendars, and document systems to which they would need access in order to respond fully and completely to interview questions in the course of a purported internal investigation and to continue to assist in the transition of their work to new management.

75.     Contradictorily, on November 2, 2022, Twitter asserted via emails to each of the Plaintiffs from Kathleen Pacini that each Plaintiff remained a Twitter employee "until November 27, 2022," implying that the last day of active employment would be November 26, 2022.

76.     Ms. Pacini's email to Mr. Sullivan did not mention participation in an investigation and requested only that he make himself available for discussions "regarding [his] role and transitioning key functions [he] oversaw" and that he "prepare a summary of all of [his] current projects and the Company stakeholders associated with such projects."

77.     Twitter continued to treat each Plaintiff as a discharged employee after October 31, 2022; Twitter did not rescind or remedy its lock-out of Plaintiffs from the Twitter office or accounts.  Twitter also failed to pay each Plaintiff the salary

and benefits they had received as employees, including but not limited to payment of each Plaintiff's November 1, 2022 vesting of equity, which upon information and belief was provided to all employees other than Plaintiffs, and salary for the November 14, 2022 and November 28, 2022 pay periods.

78. Upon information and belief, human resources staff at the Company were instructed to terminate Plaintiffs' employment from October 31, 2022.

79. Ms. Brand and Ms. Personette continued to communicate their willingness to participate in the internal investigation. At the same time, Twitter continued to communicate that it was in the process of providing salary and benefits and was also preparing separation agreements for Ms. Brand and Ms. Personette in which they would be provided with their severance benefits under the Plan.

80. On November 17, 2022, Ms. Pacini for the first time reached out to Mr. Sullivan to request his availability to participate in a one hour Zoom with "Company counsel" between November 17 and 22 to "assist with their investigation into potential misconduct by the Company's board, certain executives, and advisors." Ms. Pacini's email did not state that Mr. Sullivan was accused of or being investigated for any misconduct personally.

81. On November 17, 2022, Twitter also for the first time requested a forensic collection of all three Plaintiffs' personal cellular phones.

82. On November 19, 2022, Twitter's outside counsel emailed Plaintiffs' counsel stating that Twitter would provide Plaintiffs with their severance agreements once Twitter had completed its interview and phone collection, and asked for the interview times to be scheduled early the next week or "after the [Thanksgiving] holiday if you and your clients prefer." Plaintiffs were advised that "iPhone collection" could be accomplished remotely, "or we can arrange for in-person collection of android phones either next week or after the holiday."

83. Plaintiffs offered to make themselves available after the Thanksgiving holiday, which was then just two days away.

Frankfurt Kurnit Klein+Selz pc

84. Despite: (a) Twitter's counsel's express recognition of Plaintiffs' rights to payment under the Plan following their resignation; (b) Twitter's explicit statement that "no one [had] accused [them] personally of any wrongdoing"; (c) the inability of Plaintiffs to take any action with respect to Twitter once they were locked out as of November 1, 2022; (d) Twitter's communication that interviews and phone collection could take place after the holiday; and (e) the failure of the Company in the interim to raise any claimed misconduct, late on Sunday evening on Thanksgiving weekend, November 27, 2022, Twitter sent each Plaintiff a notice signed by Mr. Musk stating that his or her employment with Twitter had been terminated for "Cause" under the Plan (the "November 27 Notices").

85. Notably, the November 27 Notices were sent mere hours before the expiration of the 30-day notice and cure period following Plaintiffs' resignation for Good Reason, yet *after* Twitter's own selected end date for each Plaintiff's employment, which it stated would continue "until" November 27, 2022.

86. No detail or specific grounds were provided in the November 27 Notices other than a rote recitation of policy language:

> [Y]ou have engaged in conduct that constitutes Cause within the meaning of the Policy, including, but not limited to, prongs (c) (an uncurable "failure to comply with the Company's written policies or rules, including its code of conduct"), (e) ("your gross negligence or willful misconduct in the performance of your duties"), and (g) ("your failure to cooperate in good faith with a governmental or internal investigation of the Company or its directors, officers or employees, if the Company has requested your cooperation").

87. In light of Twitter's inconsistent and counterproductive conduct over the preceding weeks and its fact-bare recitation of Plan definitions, this after-the-fact purported termination for "Cause" was nothing more than Twitter's bad faith, pretextual attempt to deny Plaintiffs benefits to which they are entitled pursuant to the Plan.

88. No further efforts were ever made by Twitter to follow up with any of the Plaintiffs regarding their participation in an interview, even though Twitter's

counsel himself had proposed that the interview proceed in the week following Thanksgiving.

89.     No further attempts were made to collect Plaintiffs' personal devices, although that issue was also deferred at the behest of Twitter's counsel until the week after the purported "Cause" determination and termination notice.

**G.     The Denial of Plaintiffs' Claims Based on False and Shifting Reasons**

90.     Plaintiffs each submitted a Claim on December 16, 2022 (collectively, the "Claims"), demanding all compensation and benefits due to them under the Plan, including but not limited to severance benefits consisting of vesting of 50% of unvested RSUs, cash severance in the amount of 12 months of their most recent base salaries, and 12 months of COBRA benefits.

91.     The Claims articulated the grounds for each Plaintiff's entitlement to benefits under the Plan, recounting the above facts since the Change of Control period commenced, and denying any misconduct or other activity that might constitute "Cause," and reiterating the request that a severance agreement and release be promptly provided, as previously promised.

92.     The Claims demanded all documents pursuant to which the Plan is established or operated, copies of Plaintiffs' personnel files and records relating performance or to any grievance concerning them, including the basis for their purported "Cause" termination, and payroll records.

93.     The Claims advised Twitter that Plaintiffs remained in possession of certain Company property, namely laptop computers, and were awaiting instructions from Twitter as to how to return them.

94.     On April 11, 2023, Ms. Chapman sent emails to Plaintiffs' counsel attaching letters and zip files containing a partial production of documents purportedly in response to the document requests in each of the Claims.

95.     The productions comprised only the Plan documents, participation agreements, offer and position letters, and equity grant agreements.  Thus, the Plan

is the sole instrument pursuant to which the Plan is established and maintained. Ms. Chapman denied knowledge of any internal procedures regarding the claims process for the Plan.  The letter ignored Plaintiffs' demand for records of their purported termination for "Cause." Upon information and belief, such records do not exist.

96.     Ms. Chapman's letters stated that "I – Lindsay Chapman – am the person currently acting as the Administrator of the Plan" but did not provide any other documents identifying her as the Administrator.

97.     On June 14, 2023, Ms. Chapman sent another round of letters on behalf of the Company denying Plaintiffs' Claims (collectively, the "Denials" or "Claim Denials") purportedly upon a determination that there were grounds for the Company to terminate Plaintiffs' employment for Cause.

98.     In the Denials, Twitter acknowledged that Plaintiffs were each Eligible Employees under the Plan and that they were terminated during a Change of Control Period. Among other rationales that the plain language of the Plan and merger documents refuted on their face, it purported to deny Plaintiffs' entitlement to benefits under the Plan on the grounds that: a) their "Good Reason" resignation was not timely because Twitter terminated them, despite the fact that Twitter had already told them their resignations were effective; and b) even if they had already resigned, Mr. Musk could still terminate them for Cause due to their "failure to cooperate with the investigation," their failure to turn over their personal mobile devices "in order to assist the Company with an internal investigation," and for "gross negligence and willful misconduct in the performance of [their] duties." Ms. Chapman also asserted that the Board had "clarified" that the Plan did not allow for any acceleration of time-based vesting of equity, despite the Plan plainly stating otherwise.

99.     In support of its Denials, Twitter contended that it did not cease to be a publicly traded company until it was de-listed from the NYSE on November 8, 2022 or dissolved the Board.  However, in a Form 8-K filing with the SEC, Twitter stated that "on October 27, 2022 and as a result of the consummation of the Merger, Mr.

Frankfurt Kurnit Klein+Selz pc

Frankfurt Kurnit Klein+Selz℠

1  Musk became the sole director of Twitter" thus indicating that Twitter regarded

2  itself as no longer publicly traded on October 27, 2022.

3      100.    The Denials also alleged that Plaintiffs' "failure to participate in the

4  investigation" including by sitting for interviews and by producing personal phones

5  for forensic collection rose to the level of "Cause." To the contrary, Plaintiff

6  Sullivan was not even approached to participate until November 17, 2022 and the

7  issue of phone collection was not raised for any Plaintiff until that date.  Plaintiffs

8  continued to express their willingness to participate, and Twitter indicated that dates

9  after Thanksgiving were acceptable for all Plaintiffs for both interviews and phone

10  collection. Twitter also continued to rely on Plaintiffs' status as Twitter employees

11  during this period, while in all other ways treating them as discharged employees,

12  locking them out of the office and failing to pay them while making representations

13  that payment and benefits, including severance benefits, would be paid shortly.

14  Twitter also made no efforts subsequent to November 27, 2022 to collect Plaintiffs'

15  company-owned computers, except that Twitter instigated collection of Mr.

16  Sullivan's computers via text message on January 31, 2023, and he returned the

17  devices via FedEx on February 6, 2023.  Twitter made no efforts to collect

18  Plaintiffs' personal mobile devices although upon information and belief the

19  investigation remained ongoing.

20      101.    Upon information and belief, Twitter also denied benefits to a similar

21  executive who did participate in the investigation and appear for an interview,

22  indicating that this purported basis for the Denials was in fact a sham.

23      102.    To the extent that the Denials assert "gross negligence and willful

24  misconduct in the performance of [their] duties"[3] as a final basis for Cause, such

25  assertion has no factual basis, and is merely a pretext to deny rightfully earned

26

27  _____

[3] To the extent that Twitter produced Plaintiffs' personnel files, such files contained

28  no record or complaint of poor performance, gross negligence or willful misconduct.

1  benefits.

2      103.   While first asserting a number of bases that it was later forced to

3  abandon as they were patently unsupportable,[4] Twitter eventually reduced its

4  grounds to a single allegation that each Plaintiff wrongfully issued retention bonuses

5  to key employees that Twitter now asserts were "outside the ordinary course" and

6  thus constituted "corporate waste" even though they were in accordance with the

7  budgets set by higher-level executives in the ordinary course of business to retain

8  key employees, and were approved by the Board.

9      104.   To the extent that Plaintiffs specifically requested production of

10  documents with respect to allegations of corporate waste and cost cutting, Twitter

11  refused to produce such documents, claiming that they were not "submitted,

12  considered or generated in the course of making the benefit determination." To the

13  extent that these documents were relied upon as a basis for concluding that Plaintiffs

14  were terminated for cause within the meaning of the Plan, they should have been

15  produced.

16      105.   While not providing documents or support for this contention, this

17  premise for "Cause" is also pretextual and devoid of evidence as Twitter was well

18  aware that any bonuses provided were immaterial, were made in the ordinary course

19  and with approval of executives and the Board, and were in fact necessary in order

20  to provide Mr. Musk with a working and effective company, product and

21  engineering team at a time when staff were resigning from Twitter at a substantial

22  rate and executives including Plaintiffs were aware that Mr. Musk had previously

23  objected in legal filings to Twitter allowing key staff to leave.

24  _____

25  [4] For example, Twitter later dropped its allegations that Plaintiffs failed to prevent
    certain kinds of wasteful overspending on headcount, real estate, fringe benefits and

26  contractor expenses that took place in departments for which they had no decision-
    making authority, or which occurred during periods of time in which some were not

27  in decision making or roles or were not even employed by the Company.

28

Frankfurt Kurnit Klein+Selz rc

**H.     Plaintiffs Timely Appealed the Improper Denial of Their Claims**

106.   On November 7, 2023, Plaintiffs submitted timely requests for review of the Denials to the self-designated "Twitter Severance Administration Committee" (the "Committee") (collectively the "Appeals"). The Appeals were accompanied by supporting documentary evidence, which refuted each of Twitter's purported bases for denying Plaintiffs' Claims. Each Plaintiff also renewed their request for relevant documents including with respect to cost cutting activities and objected to the denial of their requests for documents.

107.   The Appeals and supporting documents established that at all times, Plaintiffs' authorization of retention bonuses was authorized by the Board in the ordinary course of business, was consistent with past practices and therefore compliant with the Merger Agreement and was issued for the critical purpose of retaining key employees through a turbulent transition. In addition, the Appeals refuted incorrect interpretations of the Plan, the Merger Agreement, and various related documents (including contending, without support, that the Merger Agreement disallowed any accelerated vesting of equity, despite Twitter's own proxy statement informing shareholders that such accelerated vesting was allowed), and flatly disproved the claim that Plaintiffs had engaged in any sort of corporate waste or fraud (an assertion with which Twitter has now abandoned) including by the lack of any negative feedback in Plaintiffs' personnel files.

108.   The Appeals and supporting documents also established that Plaintiffs had timely resigned for Good Reason, had at all times fully indicated a good faith willingness to participate in the investigation despite Twitter's manipulative and self-serving designation of them as employees in order to mandate participation in the investigation but not paying them or otherwise treating them like employees, that Twitter denied the claim of an  executive who did participate in the same investigation suggesting that this is not a sufficient ground to deny benefits, that Twitter had only just asked for turnover of Plaintiffs' personal phones which

1   Plaintiffs were scheduling to provide after reaching agreement on certain personal
2   data protections, and that Twitter at or around that time clearly communicated that it
3   was not accusing Plaintiffs of any misconduct or wrongdoing but was rather actively
4   preparing documents to pay severance benefits under the Plan. Twitter accused
5   Plaintiffs of evasive activity and of trying to "run down the clock" when in fact that
6   is exactly what Twitter had been doing.

7   **I.      The Committee's Denial of Plaintiffs' Appeals on Changing Grounds**

8   109.   On information and belief, the purported Committee was comprised of
9   Ms. Chapman, Mr. Bjelde, Mr. Batura, and other current or former members, all of
10  whom are currently or were recently employed by Mr. Musk's other companies.  On
11  information and belief, the Committee and each of its members were at all relevant
12  times acting in the financial interests of X Corp. and Mr. Musk.

13  110.   On March 6, 2023, the Committee denied Plaintiffs' request for review
14  (collectively the "Appeal Denials").

15  111.   In reviewing each of the Plaintiffs' Appeals of their improperly denied
16  Claims, the purported Committee echoed many of the unfounded claims of the
17  previous denials, dropped other claims for which they admitted no basis existed, and
18  in addition included new grounds that had not been contained in the Claims Denials
19  and for which Plaintiffs were not provided an opportunity to respond or submit
20  evidence.

21  112.   Apparently unable to find any evidence to retroactively bolster the
22  Claim Denials, the purported Committee abandoned in the Appeal Denials the
23  argument that Plaintiffs were grossly negligent or otherwise culpable for alleged
24  corporate waste based on the alleged company-wide spending increases, which it
25  was forced to admit occurred before Plaintiffs became members of Staff.  The
26  purported Committee concluded this was not a basis to terminate Plaintiffs for
27  Cause.

28  113.   As in the Claim Denials, in the Appeal Denials the purported

Frankfurt Kurnit Klein+Selz PC

Committee concluded that Cause existed because Plaintiffs failed to cooperate in an internal Company investigation, ignoring the fact that the Company had shut them out of all systems, thus impeding their ability to meaningfully contribute, that Plaintiffs demonstrated a continued willingness to assist in a fair investigation despite mounting signs of the Company's bad faith, and ignoring the fact that Plaintiffs relied on the assurances of the Company's own counsel that the separation agreements and releases would be ready imminently, and that they would be able to sit for their interviews after the Thanksgiving weekend in late November 2022. The purported Committee incorrectly found that Plaintiffs were conditioning or leveraging their cooperation on a receipt of benefits, when instead, the record clearly shows that they were willing to participate in a reasonable investigation throughout, and only requested what the Company had already promised as a show of good faith in the face of increasingly alarming and contradictory actions.

114.   The purported Committee also wrongfully concluded that Plaintiffs' continued "refusal to provide [their phones] for forensic collection" was not capable of cure despite the fact that Plaintiffs were engaging in conversations about how to do so, based on the factually inaccurate premise that Plaintiffs "knew for far more than 30 days that Company sought access" to their phones when in fact the request had first been made on November 17, 2022 and the purported terminations occurred on November 27, 2022 at the conclusion of a four day national holiday.

115.   The purported Committee also continued the erroneous arguments from the Claims Denials that Plaintiffs engaged in gross negligence or willful misconduct based on reasonable and not materially significant retention bonuses that had been provided in the normal course and with Board approval.

116.   The purported Committee further demonstrated its bias and bad faith by including new arguments in the Appeal Denials for which Plaintiffs had not been provided an opportunity to respond, including that the brief delay in returning their phones was a separate "Cause" event because confidentiality agreements and

privacy policies allowed employees to conduct Company business on certain applications like Google Workspace and Slack, but the Committee had concluded, based solely on the Plaintiffs' attempts to discuss alternate ways to provide the requested data, that Plaintiffs must have been conducting Company business in "other ways including by text message" that were not permitted and that had caused the Company to "lose trust."

117.   The purported Committee also added additional arguments with respect to Ms. Brand and Mr. Sullivan, including that Ms. Brand wrongfully proposed to the Compensation Committee of the Board that she and other executives be added to the Plan during the Merger Period, and that she and Mr. Sullivan engaged in misconduct by signing an agreement to participate in the Plan.

118.   These additional allegations misstate the facts and are transparent efforts to bolster the Company's weak arguments.

119.   The premise that Plaintiffs' attempt to negotiate commonplace protections for their personal data while simultaneously cooperating with requests for forensic examination is the flimsiest possible basis for determining that skilled and successful executives must be engaging in the destruction of evidence or that they must have been improperly communicating via non-sanctioned methods such as text message. That the Company did not even bother to collect phones or laptop computers post-termination also suggests that this explanation was pretextual.

120.   Nor did Plaintiffs engage in any misconduct by signing their Plan Participation Agreements, which had been made available to the employees who previously held the same titles/positions and which were approved by the Compensation Committee of the Board in the ordinary course of business and consistent with prior practice.

**J.    The Appeal Denials Fail to Apply the Plan's Written Terms with Respect to the Acceleration of Equity**

121.   The Plan expressly provides for the acceleration of equity in the event

of a COC Qualified Termination. Specifically, the Plan provides that as part of the severance benefits owed to Plaintiffs, each will be entitled to "a percentage set forth on your Participation Agreement of the then-unvested shares subject to each of your then-outstanding equity awards shall immediately vest and, in the case of options and stock appreciation rights, shall become exercisable . . . ." Each of the Plaintiffs' Participation Agreements provides that their equity vesting acceleration benefit percentage is 50%.

122.    During the course of their employment with Twitter, Plaintiffs were granted equity awards in the form of both Restricted Stock Units ("RSUs") and Performance-Based Restricted Stock Units ("PSUs"). The RSUs vested solely through the passage of time, contingent upon continued employment through each vesting date and subject to additional provisions that accelerate vesting in the event of certain types of terminations of employment. The PSUs vested both upon the achievement of performance criteria and through the passage of time, contingent upon continued employment through each vesting date and subject to vesting acceleration provisions in the event of certain types of terminations of employment.

123.    Both the PSU and RSU Award Agreements explicitly contemplate other documents that could affect accelerated vesting, which would supersede the standard vesting schedule under certain circumstances, such as a COC Qualified Termination under the Plan. Each of the Award Agreements also explicitly provide that the awards will be subject to any vesting acceleration provisions contained in such documents.

## K.    The Merger Agreement

124.    On April 25, 2022, Twitter entered into a Merger Agreement pursuant to which it was to be acquired by X Holdings I, Inc. and X Holdings II, Inc.

125.    Section 3.6(b)(ii) of the Merger Agreement addressed the treatment of the PSUs in the merger and provided as follows:

As of the Effective Time, each Company PSU that is outstanding

immediately prior thereto and that is not a Vested Company PSU (each, an "Unvested Company PSU") shall be canceled and converted into the right to receive an amount in cash, without interest, equal to the product of (i) the total number of shares of Company Common Stock subject to such Unvested Company PSU based on the achievement of the applicable performance metrics at the target level of performance and (ii) the Merger Consideration (the "Unvested PSU Consideration"). Subject to the holder's continued service with Parent and its Affiliates (including the Surviving Corporation and its Subsidiaries) through the applicable vesting dates, such Unvested PSU Consideration will vest and become payable at the same time as the Unvested Company PSU from which [it] was converted **would have vested and been payable pursuant to its terms and shall otherwise remain subject to the same terms and conditions as were applicable to the underlying Unvested Company PSU immediately prior to the Effective Time** (except that performance-based vesting metrics and criteria shall not apply from and after the Effective Time). (Emphasis added.)

126.   Similarly, Section 3.6(d)(ii) of the Merger Agreement addressed the treatment of the RSUs in the merger and provided as follows:

As of the Effective Time, each Company RSU that is outstanding immediately prior thereto and that is not a Vested Company RSU (each, an "Unvested Company RSU") shall be canceled and converted into the right to receive an amount in cash, without interest, equal to the product of (i) the total number of shares of Company Common Stock subject to such Unvested Company RSU and (ii) the Merger Consideration (the "Unvested RSU Consideration"). Subject to the holder's continued service with Parent and its Affiliates (including the Surviving Corporation and its Subsidiaries) through the applicable vesting dates, such Unvested RSU Consideration will vest and become payable at the same time as the Unvested Company RSU from which [it] was converted **would have vested and been payable pursuant to its terms and shall otherwise remain subject to the same terms and conditions as were applicable to the underlying Unvested Company RSU immediately prior to the Effective Time**." (Emphasis added.)

127.   The effects of Sections 3.6(b)(ii) and 3.6(d)(ii) of the Merger Agreement were to (1) convert the right to receive Twitter stock under the terms of the PSUs and RSUs into a right to receive an equivalent amount of cash (for both) that would then become vested on the same terms and conditions as were previously applicable to the PSUs and RSUs; and (2) to deem the performance-based metrics no longer applicable for the PSUs (meaning the PSUs would vest solely on the passage of time and subject to acceleration in the same manner as the RSUs). Outside of those two changes, the language made it clear that all other terms and conditions of the awards—which include vesting acceleration provisions—were to

1    remain unchanged.

2       128.   The Twitter Board of Directors approved the treatment of both the

3    PSUs and the RSUs consistent with Sections 3.6(b)(ii) and 3.6(d)(ii) of the Merger

4    Agreement in its April 25, 2022, board minutes.

5    **L.    The Proxy Statement**

6       129.   On May 25, 2022, following the execution of the Merger Agreement,

7    Twitter issued a proxy statement (the "Proxy Statement"). Saliently, with respect to

8    the purpose of the Plan, the Proxy Statement states as follows:

> We believe that to properly motivate and incentivize our executive team
> in the event of a change of control and to the possibility of a termination
> without 'cause' or a termination with 'good reason,' a standardized
> 'double trigger' change of control and severance policy is critical. Each
> NEO [named executive officer] that remains employed with us
> participates in our Severance Policy, which provides standardized
> payments and benefits to the NEOs in the event of a termination without
> 'cause' by us or termination for 'good reason' by the participant, whether
> or not in connection with a change of control, to make these benefits
> consistent among the executives who have these arrangements.

15   This description makes it clear that Twitter considered it "critical" to have the

16   Plan in place.

17      130.   The Proxy Statement contains a paragraph titled "Potential Payments

18   Upon Termination or Change of Control." This paragraph describes the benefits that

19   are provided under the Plan to participants and states that one of the benefits

20   provided under the Plan is "acceleration of vesting of 50% . . . of the shares

21   underlying all of the NEO's then-unvested equity awards if the Involuntary

22   Termination is in connection with a Change of Control." This language tracks the

23   benefits that are described in Plaintiffs' Participation Agreements with respect to

24   equity award vesting acceleration (50% vesting acceleration of all unvested equity

25   awards).

26      131.   The Proxy Statement is Twitter's official statement to investors and is

27   required by the SEC and securities laws to be true and accurate. Thus, it is notable

28   that in the Proxy Statement issued after the Merger Agreement was signed, Twitter's

Frankfurt Kurnit Klein+Selz rc

interpretation of the Plan and the Participation Agreement was that the participants would receive accelerated equity vesting as part of their severance benefits.  At no time did the Company act to modify, amend, or correct the statement notifying the shareholders (including the Plan participants) that the Plan provided for accelerated vesting of time-based equity awards.[5]

132.    Thus, the only reasonable interpretation of the Plan, the Equity Awards, the Merger Agreement, and the Proxy Statement, each of which acknowledges the existence of and are read consistently with the other documents, is that Plaintiffs are each entitled to 50% of their Unvested Equity. To the extent that now contend that the Merger Agreement eliminated the right to accelerated vesting of equity, that decision is plainly wrong.

**M.    Twitter Failed to Pay Plaintiffs Their Vested Equity Awards on November 1, 2022 While They Were Still Employed at Twitter.**

133.    Under the terms of their various equity agreements, including the Award Agreements, Plaintiffs' equity continued to vest while they were still employed.  By the Company's own admission, each of the Plaintiffs was still an employee on November 1, 2022.  However, Twitter failed to vest (and pay) the shares that were due to vest on that date. Twitter's failure to vest these shares breached each of the Equity Agreements.

**(i)    Ms. Personette's Unpaid Equity Vest While An Employee**

134.    On April 8, 2019, Ms. Personette and Twitter entered into a Restricted Stock Unit Agreement, which granted Ms. Personette 23,498 Restricted Stock Units

---

[5] Twitter filed a similar Proxy Statement in September 2022 in advance of its September 13, 2022 shareholder meeting in which shareholders were asked to vote on a proposal to adopt the Merger Agreement. The September 2022 Proxy Statement similarly disclosed the severance benefits to which Plaintiffs and other executives would be entitled including the "acceleration of vesting of unvested equity awards (with performance-based vesting deemed achieved at target levels as to that percentage)."

Frankfurt Kurnit Klein+Selz PC

(RSUs) to vest quarterly beginning on February 1, 2021.  The RSUs vested and were granted to Ms. Personette according to the schedule of 1,958 RSUs on each of the first four quarterly vests: February 1, 2021, May 1, 2021, August 1, 2021, November 1, 2021, followed by 3,916 RSUs on each of February 1, 2022, May 1, 2022, and August 1, 2022. On November 1, 2022, another 3,917 RSUs were due to vest, but Twitter failed to vest this tranche, notwithstanding that Ms. Personette remained a current employee on November 1, 2022, as Twitter admits.  Pursuant to the Merger Agreement, Twitter was to pay out RSUs at $54.20/share. Thus, Twitter failed to pay Ms. Personette $212,301.40 under this agreement.[6]

135.   On April 12, 2020, Ms. Personette and Twitter entered into a Restricted Stock Unit Agreement, which granted Ms. Personette 202,038 RSUs to vest quarterly beginning on May 1, 2020.  The RSUs vested and were granted to Ms. Personette according to the schedule of either 12,627 or 12,628 RSUs on each of following quarterly vests: May 1, 2020, August 1, 2020, November 1, 2020, February 1, 2021, May 1, 2021, August 1, 2021, November 1, 2021, February 1, 2022, May 1, 2022, and August 1, 2022.  On November 1, 2022, another 12,628 RSUs were due to vest, but Twitter failed to vest this tranche, notwithstanding that Ms. Personette remained a current employee on November 1, 2022, as Twitter admits.  Pursuant to the Merger Agreement, Twitter was to pay out RSUs at $54.20/share. Thus, Twitter failed to pay Ms. Personette $684,437.60 under this agreement.

136.   On April 8, 2021, Ms. Personette and Twitter entered into a Restricted Stock Unit Agreement, which granted Ms. Personette 101,185 RSUs to vest quarterly beginning on May 1, 2021.  The RSUs vested and were granted to Ms. Personette according to the schedule of 6,324 RSUs on each of the following

---

[6] All valuations are based on Plaintiffs' knowledge and belief and are subject to proof.

Frankfurt Kurnit Klein+Selz ᴘᴄ

quarterly vests: May 1, 2021, August 1, 2021, November 1, 2021, February 1, 2022, May 1, 2022, and August 1, 2022.  On November 1, 2022, another 6,324 RSUs were due to vest, but Twitter failed to vest this tranche, notwithstanding that Ms. Personette remained a current employee on November 1, 2022, as Twitter admits. Pursuant to the Merger Agreement, Twitter was to pay out RSUs at $54.20/share. Thus, Twitter failed to pay Ms. Personette $342,760.80 under this agreement.

137.   On September 1, 2021, Ms. Personette and Twitter entered into a Restricted Stock Unit Agreement, which granted Ms. Personette 5,802 Restricted Stock Units (RSUs) to vest quarterly beginning on November 1, 2021.  The RSUs vested and were granted to Ms. Personette according to the schedule of 362 RSUs on each of quarterly vest: November 1, 2021, February 1, 2022, May 1, 2022, and August 1, 2022. On November 1, 2022, another 363 RSUs were due to vest, but Twitter failed to vest this tranche, notwithstanding that Ms. Personette remained a current employee on November 1, 2022, as Twitter admits.  Pursuant to the Merger Agreement, Twitter was to pay out RSUs at $54.20/share. Thus, Twitter failed to pay Ms. Personette $19,674.60 under this agreement.

138.   On April 13, 2022, Ms. Personette and Twitter entered into a Restricted Stock Unit Agreement, which granted Ms. Personette 110,865 RSUs to vest quarterly beginning on May 1, 2022.  The RSUs vested and were granted to Ms. Personette according to the schedule of 6,929 RSUs on each of the following quarterly vests: May 1, 2022 and August 1, 2022.  On November 1, 2022, another 6,929 RSUs were due to vest, but Twitter failed to vest this tranche, notwithstanding that Ms. Personette remained a current employee on November 1, 2022, as Twitter admits.  Pursuant to the Merger Agreement, Twitter was to pay out RSUs at $54.20/share. Thus, Twitter failed to pay Ms. Personette $375,551.80 under this agreement.

**(ii)    Mr. Sullivan's Unpaid Equity Vest While an Employee**

139.   On March 22, 2022, Mr. Sullivan and Twitter entered into a Restricted

Stock Unit Agreement, which granted Mr. Sullivan 125,945 Restricted Stock Units (RSUs) to vest quarterly beginning on May 1, 2022. The RSUs vested and were granted to Mr. Sullivan according to the schedule of 7,871 RSUs on May 1, 2022 and August 1, 2022. On November 1, 2022, another 7,871 RSUs were due to vest, but Twitter failed to vest this tranche, notwithstanding that Mr. Sullivan remained a current employee on November 1, 2022, as Twitter admits. Pursuant to the Merger Agreement, Twitter was to pay out RSUs at $54.20/share. Thus, Twitter failed to pay Mr. Sullivan $426,608.20 under this agreement.

140.    On April 28, 2022, Mr. Sullivan and Twitter entered into a Restricted Stock Unit Agreement, which granted Mr. Sullivan 6,930 RSUs to vest quarterly beginning on May 1, 2022. The RSUs vested and were granted to Mr. Sullivan according to the schedule of 433 RSUs on each of following quarterly vests: May 1, 2022, and August 1, 2022. On November 1, 2022, another 433 RSUs were due to vest, but Twitter failed to vest this tranche, notwithstanding that Mr. Sullivan remained a current employee on November 1, 2022, as Twitter admits. Pursuant to the Merger Agreement, Twitter was to pay out RSUs at $54.20/share. Thus, Twitter failed to pay Mr. Sullivan $23,468.60 under this agreement.

**(iii)    Ms. Brand's Unpaid Equity Vest While an Employee**

141.    On April 8, 2019, Ms. Brand and Twitter entered into a Restricted Stock Unit Agreement, which granted Ms. Brand 86,821 Restricted Stock Units (RSUs) to vest quarterly beginning on May 1, 2019. The RSUs vested and were granted to Ms. Brand according to the schedule of 7,887 or 7,888 RSUs on each of the first eight quarterly vests from May 1, 2019 through November 1, 2020, followed by 4,937 RSUs on each of the next four quarterly vests from February 1, 2021 through November 1, 2021, followed by 2,964 or 2,965 on each of: February 1, 2022, May 1, 2022, and August 1, 2022. On November 1, 2022, another 2,965 RSUs were due to vest, but Twitter failed to vest this tranche, notwithstanding that Ms. Brand remained a current employee on November 1, 2022, as Twitter admits.

Pursuant to the Merger Agreement, Twitter was to pay out RSUs at $54.20/share. Thus, Twitter failed to pay Ms. Brand $160,703.00 under this agreement.

142.   On April 12, 2020, Ms. Brand and Twitter entered into a Restricted Stock Unit Agreement, which granted Ms. Brand 47,435 RSUs to vest quarterly beginning on May 1, 2020.  The RSUs vested and were granted to Ms. Brand according to the schedule of either 2,964 or 2,965 RSUs on each of following quarterly vests: May 1, 2020, August 1, 2020, November 1, 2020, February 1, 2021, May 1, 2021, August 1, 2021, November 1, 2021, February 1, 2022, May 1, 2022, and August 1, 2022.  On November 1, 2022, another 2,965 RSUs were due to vest, but Twitter failed to vest this tranche, notwithstanding that Ms. Brand remained a current employee on November 1, 2022, as Twitter admits.  Pursuant to the Merger Agreement, Twitter was to pay out RSUs at $54.20/share. Thus, Twitter failed to pay Ms. Brand $160,648.80 under this agreement.

143.   On October 17, 2020, Ms. Brand and Twitter entered into a Restricted Stock Unit Agreement, which granted Ms. Brand 31,485 RSUs to vest quarterly beginning on November 1, 2020.  The RSUs vested and were granted to Ms. Brand according to the schedule of 1,967 or 1,968 RSUs on each of the following quarterly vests: November 1, 2020, February 1, 2021, May 1, 2021, August 1, 2021, November 1, 2021, February 1, 2022, May 1, 2022, and August 1, 2022.  On November 1, 2022, another 1,968 RSUs were due to vest, but Twitter failed to vest this tranche, notwithstanding that Ms. Brand remained a current employee on November 1, 2022, as Twitter admits.  Pursuant to the Merger Agreement, Twitter was to pay out RSUs at $54.20/share. Thus, Twitter failed to pay Ms. Brand $107,059.20 under this agreement.

144.   On April 8, 2021, Ms. Brand and Twitter entered into a Restricted Stock Unit Agreement, which granted Ms. Brand 20,237 RSUs to vest quarterly beginning on May 1, 2021.  The RSUs vested and were granted to Ms. Brand according to the schedule of 1,264 or 1,265 RSUs quarterly between May 1, 2021

and August 1, 2022.  On November 1, 2022, another 1,265 RSUs were due to vest, but Twitter failed to vest this tranche, notwithstanding that Ms. Brand remained a current employee on November 1, 2022, as Twitter admits.  Pursuant to the Merger Agreement, Twitter was to pay out RSUs at $54.20/share.  Thus, Twitter failed to pay Ms. Brand $68,816.00 under this agreement.

145.   On December 14, 2021, Ms. Brand and Twitter entered into a Restricted Stock Unit Agreement, which granted Ms. Brand 64,015 RSUs to vest quarterly beginning on February 1, 2022.  The RSUs vested and were granted to Ms. Brand according to the schedule of 4,000 or 4,001 RSUs on each of the following quarterly vests: February 1, 2022, May 1, 2022, and August 1, 2022.  On November 1, 2022, another 4,001 RSUs were due to vest, but Twitter failed to vest this tranche, notwithstanding that Ms. Brand remained a current employee on November 1, 2022, as Twitter admits.  Pursuant to the Merger Agreement, Twitter was to pay out RSUs at $54.20/share. Thus, Twitter failed to pay Ms. Brand $217,654.40 under this agreement.

146.   On April 13, 2022, Ms. Brand and Twitter entered into a Restricted Stock Unit Agreement, which granted Ms. Brand 6,930 RSUs to vest quarterly beginning on May 1, 2022.  The RSUs vested and were granted to Ms. Brand according to the schedule of 43 RSUs quarterly between May 1, 2022 and August 1, 2022.  On November 1, 2022, another 433 RSUs were due to vest, but Twitter failed to vest this tranche, notwithstanding that Ms. Brand remained a current employee on November 1, 2022, as Twitter admits.  Pursuant to the Merger Agreement, Twitter was to pay out RSUs at $54.20/share. Thus, Twitter failed to pay Ms. Brand $23,555.20 under this agreement.

## LEGAL CLAIMS

### FIRST CAUSE OF ACTION
**(ERISA § 502(a)(1)(B), 29 U.S.C. § 1132(a)(1)(B))**
**(Claim for Benefits) (Against All Defendants)**

147.   Plaintiffs re-allege and incorporate by reference each and every

paragraph above as though fully set forth herein.

148.   ERISA § 502(a)(1)(B), 29 U.S.C. § 1132(a)(1)(B), permits a plan participant to bring a civil action to recover benefits due to her under the terms of a plan, to enforce her rights under the terms of a plan, and/or to clarify her right to future benefits under the terms of a plan.

149.   Each of the Plaintiffs is entitled to benefits under the Plan.

150.   Defendants, and each of them, have violated, and continue to violate, the terms of the Plan and Plaintiffs' rights thereunder. Defendants, and each of them, have failed to pay Plaintiffs benefits to which they are entitled under the terms of the Plan.

151.   Plaintiff Sarah Personette is entitled to severance benefits under the terms of the Plan in the amount of no less than $17,605,325.30, plus interest, with the precise amount to be proven at trial.

152.   Plaintiff James ("Jay") Sullivan is entitled to severance benefits under the terms of the Plan in the amount of no less than $21,785,500.30, plus interest, with the precise amount to be proven at trial.

153.   Plaintiff Dalana Brand is entitled to severance benefits under the terms of the Plan in the amount of no less than $13,964,359.00, plus interest, with the precise amount to be proven at trial.

**SECOND CAUSE OF ACTION**
**(Interference with Protected Rights in Violation of ERISA § 510, 29 U.S.C. § 1140**
**Against Defendants Elon Musk and X Corp.)**

154.   Plaintiffs re-allege and incorporate by reference each and every paragraph above as though fully set forth herein.

155.   ERISA § 510, 29 U.S.C. § 1140, provides that it is unlawful for any person to "discharge, fine, suspend, expel, discipline, or discriminate against a participant for exercising any right to which he is entitled under the provisions of an employee benefit plan . . . or for the purpose of interfering with the attainment of

any right to which such participant may become entitled under the plan."

156.   The Plan confers on participants the right to terminate employment for "Good Reason" in the event of "a material adverse change in the nature or scope of your authority, powers, functions, duties, responsibilities, or reporting relationship (including ceasing to directly report to the chief executive officer or board of directors of a publicly traded entity, as applicable)."

157.   The Plan provides that a participant may terminate employment for Good Reason by giving notice within 90 days after the participant has knowledge of an event constituting Good Reason, specifically identifying the event or circumstance that constitutes Good Reason and allowing Twitter a 30-day "notice and cure period."

158.   Each Plaintiff complied with the Plan's requirements by providing notice of Good Reason on October 28, 2022, specifically identifying the consummation of the take-private transaction as the event constituting Good Reason and acknowledging his or her availability to continue working during the 30-day notice-and-cure period.

159.   Twitter responded by cutting off each Plaintiff's access to all Twitter systems and informing each Plaintiff that he or she would be employed until November 27, 2022 – that is, until the end of the 30-day notice-and-cure period.

160.   On November 27, 2022, Twitter sent a notice of termination to each Plaintiff, falsely claiming that the termination was for Cause.

161.   Defendants Twitter and Musk retaliated against Plaintiffs for exercising their rights under the Plan to provide notice of Good Reason, including by (1) cutting off Plaintiffs' access to Twitter systems during the notice-and-cure period; (2) instructing Twitter's human resources department to treat Plaintiffs as terminated employees as of October 31, 2022; (3) purporting to preemptively terminate Plaintiffs' employment for cause on the last day of the notice-and-cure period; (4) failing to pay Plaintiffs' salaries and to make associated 401(k) matching

Frankfurt Kurnit Klein+Selz ᴾᶜ

contributions during the notice-and-cure period; (5) failing to pay Plaintiffs' equity vest due November 1, 2022; and (6) related acts and omissions.

162.    In particular, as to Plaintiff Personette, Defendants Twitter and Musk failed to pay $50,000 in salary owed for the 30-day period, plus $1,634,726.20 in equity that vested November 1, 2022.

163.    As to Plaintiff Brand, Defendants Twitter and Musk failed to pay $50,000 in salary owed for the 30-day period, plus $738,436.60 in equity that vested November 1, 2022.

164.    As to Plaintiff Sullivan, Defendants Twitter and Musk failed to pay $50,000 in salary owed for the 30-day period, plus $450,076.80 in equity that vested November 1, 2022.

165.    Defendants Twitter and Musk also interfered with Plaintiffs' attainment of rights under the Plan by purporting to preemptively terminate Plaintiffs' employment for cause on the last day of the notice-and-cure period.

166.    ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3), permits a plan participant to bring a suit to obtain appropriate equitable relief to enforce the provisions of Title I of ERISA. Section 510 is part of Title I.

167.    Plaintiffs are entitled to appropriate equitable relief from Defendants' violations, including in the form of an order that Defendants Twitter and Musk disgorge profits derived from their failure to pay salaries, equity, and Plan benefits; that they be estopped from denying that Plaintiffs were employed and entitled to salary and equity vesting from October 28 through November 27, 2022, and that Plaintiffs are entitled to Plan benefits; that Plaintiffs are entitled to salary, equity, and Plan benefits by reason of an equitable lien by agreement; and such other and further equitable relief as the Court deems appropriate.

### THIRD CAUSE OF ACTION
**(Breach of Contract)**
**(Against Defendant X Corp.)**

168.    Plaintiffs re-allege and incorporate by reference each and every

1 paragraph above as though fully set forth herein.

2   169.   Plaintiffs provided valuable consideration under their Award
3 Agreements by continuing their employment with Twitter. Each of the Plaintiffs
4 fully performed under the Award Agreements by remaining employed until their
5 Good Reason resignation became effective on November 27, 2022 and otherwise
6 complying with all other terms of the respective Award Agreements.

7   170.   Twitter breached each of the Award Agreements when it failed to
8 compensate Plaintiffs as promised under the respective Award Agreements, by
9 refusing to vest their November 1, 2022, equity tranches of RSUs without
10 justification.

11   171.   As a result of Twitter's breach of the respective equity agreements,
12 Plaintiff Sarah Personette is entitled to specific performance or damages of no less
13 than: $1,634,726.20 or according to proof, plus interest at the applicable rate.

14   172.   As a result of Twitter's breach of the respective equity agreements,
15 Plaintiff James Sullivan is entitled to specific performance or damages of no less
16 than: $450,076.80 or according to proof, plus interest at the applicable rate.

17   173.   As a result of Twitter's breach of the respective equity agreements,
18 Plaintiff Dalana Brand is entitled to specific performance or damages of no less
19 than: $738,436.60 or according to proof, plus interest at the applicable rate.

20 **FOURTH CAUSE OF ACTION**
21 **(Breach of the Implied Covenant of Good Faith and Fair Dealing)**
**(Against Defendant X Corp.)**

22   174.   Plaintiffs re-allege and incorporate by reference each and every
23 paragraph above as though fully set forth herein.

24   175.    The respective Award Agreements contain an implied covenant of
25 good faith and fair dealing, which prohibits either party from acting in a way that
26 prevents the other party from receiving the benefits of the contract.

27   176.   To the extent it purported to terminate or frustrate Plaintiffs' ability to
28 perform their duties before the expiration of the notice and cure period following

Frankfurt Kurnit Klein+Selz PC

their Good Reason resignations, Twitter improperly frustrated Plaintiffs' ability to receive the grant awards to which they are each entitled by refusing to vest their RSUs on November 1, 2022.  By depriving Plaintiffs of the benefits of the agreements which they earned by performing their duties under the contract and to which they are entitled, Twitter breached the covenant of good faith and fair dealing.

177.   As a result of Twitter's breach of the implied covenant of good faith and fair dealing, Plaintiff Sarah Personette is entitled to specific performance or damages of no less than: $1,634,726.20, or according to proof, plus interest at the applicable rate.

178.   As a result of Twitter's breach of the implied covenant of good faith and fair dealing, Plaintiff James Sullivan is entitled to specific performance or damages of no less than: $450,076.80, or according to proof, plus interest at the applicable rate.

179.   As a result of Twitter's breach of the implied covenant of good faith and fair dealing, Plaintiff Dalana Brand is entitled to specific performance or damages of no less than: $738,436.60, or according to proof, plus interest at the applicable rate.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs pray for judgment and the following specific relief against Defendants as follows:

1.   Declare that Defendants have violated the terms of the Plan by failing to pay Plaintiffs benefits in accordance with the terms of the Plan;

2.   Order Defendants, and each of them, to pay benefits to Plaintiffs under the terms of the Plan;

3.   Award damages for wage loss, including any equity grants due to Plaintiffs;

4.   Award equitable relief to Plaintiffs, including restitution, disgorgement,

front pay and/or equitable surcharge;

5.    For specific performance of the contracts alleged above;

6.    For statutory attorneys' fees and costs, pursuant to ERISA Section 502(g), 29 U.S.C. § 1132(g);

7.    For prejudgment interest and post-judgment interest as allowed by law; and

8.    For an award of such other and further relief as the Court deems just and proper.

Respectfully submitted,

DATED:  September 5, 2024          RENAKER SCOTT LLP


By:    _/s/ Teresa S. Renaker_
       Teresa S. Renaker

       FRANKFURT KURNIT KLEIN + SELZ PC
       Wendy Stryker (*pro hac vice pending*)
       Kristen Niven (*pro hac vice pending*)
       *Attorneys for Plaintiffs*

# **DEMAND FOR JURY TRIAL**

Plaintiffs hereby request trial by jury for the Third and Fourth causes of action.

Respectfully submitted,

DATED:  September 5, 2024      RENAKER SCOTT LLP


By:      */s/ Teresa S. Renaker*
         Teresa S. Renaker

         FRANKFURT KURNIT KLEIN +
         SELZ PC
         Wendy Stryker (*pro hac vice pending*)
         Kristen Niven (*pro hac vice pending*)
         *Attorneys for Plaintiffs*