Teresa S. Renaker, Cal. Bar. No. 187800
teresa@renakerscott.com
Kirsten G. Scott, Cal. Bar. No. 253464
kirsten@renakerscott.com
RENAKER SCOTT LLP
505 Montgomery Street, Suite 1125
San Francisco, California 94111
Telephone: (415) 653-1733
Facsimile: (415) 761-3953

Wendy Stryker *(pro hac vice)*
wstryker@fkks.com
Kristen Niven *(pro hac vice)*
kniven@fkks.com
FRANKFURT KURNIT KLEIN + SELZ PC
28 Liberty Street, 35th Floor
New York, NY 10005
Telephone: (212) 980-0120
Facsimile: (212) 593-9175

Attorneys for Plaintiffs

# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF CALIFORNIA

# SAN FRANCISCO DIVISION

| | |
|---|---|
| SARAH PERSONETTE, JAMES SULLIVAN, and DALANA BRAND,<br><br>Plaintiffs,<br><br>v.<br><br>ELON MUSK; X CORP., f/k/a TWITTER, INC.; TWITTER, INC. CHANGE OF CONTROL AND INVOLUNTARY TERMINATION PROTECTION POLICY; and DOES 1-20, inclusive,<br><br>Defendants. | Case No. 24-cv-06266-JSC<br><br>**PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS THE COMPLAINT'S SECOND CAUSE OF ACTION**<br><br>Hearing Date: February 13, 2025<br>Time: 10 a.m.<br>Place: Courtroom 8<br>Hon. Jacqueline Scott Corley<br><br>Complaint Filed: September 5, 2024 |

Frankfurt Kurnit Klein+Selz ᴾᶜ

# TABLE OF CONTENTS

Page

I.    INTRODUCTION ...............................................................................................1

II.   STATEMENT OF RELEVANT FACTS .........................................................2

    A.    Pertinent Terms of the Plan and Plaintiffs' Participation Agreements .....................2

    B.    Elon Musk's Takeover of Twitter Results in Plaintiffs' Involuntary Termination During a Change of Control Period........................................................3

    C.    Mr. Musk and Twitter Retaliate Against Plaintiffs for Their Good Reason Resignations ..........................................................................................................4

    D.    Mr. Musk Terminated Plaintiffs to Interfere With Their Severance Benefits............5

III.  ARGUMENT ......................................................................................................5

    A.    Legal Standard.........................................................................................................5

    B.    The Plan Is Not a Top Hat Plan, and Surcharge Is an Available Remedy on Plaintiffs' ERISA § 510 Claim................................................................................6

        1.    Top Hat Plans Are a Subset of ERISA Pension Plans ...................................6

        2.    The Plain Language of the Plan Demonstrates That It Is a Welfare Plan Designed to Protect Participants in the Event of a Company Change in Control ................................................................................................8

        3.    The Purpose of the Plan Is Not to Provide for Deferred Compensation.........................................................................................10

        4.    The Fact That the Plan Is Unfunded, and the Participants Are Executives, Does Not Demonstrate That The Plan Is a Top Hat Pension Plan .......................................................................................13

        5.    Surcharge Is an Available Remedy for Plaintiffs' ERISA Section 510 Claim ...........................................................................................14

    C.    Plaintiffs Have Sufficiently Alleged Bases for Additional Forms of Equitable Relief ..................................................................................................15

        1.    Plaintiffs Have Properly Pled Facts to Support Claims for Restitution and Disgorgement to Remedy Defendants' ERISA Section 510 Violations. ..........................................................................16

        2.    Plaintiffs Also Have Adequately Pled Facts to Support Their Entitlement to Equitable Estoppel.................................................................17

IV.   CONCLUSION .................................................................................................22

**Frankfurt Kurnit Klein + Selz** PC

**TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*Agrawal v. Musk*,
  No. 24-cv-01304-MMC, 2024 WL 4654442 (N.D. Cal. Nov. 1, 2024) ........................... 14, 15

*Akhlaghi v. Cigna Corp.*,
  2020 WL 6260012 (N.D. Cal. July 27, 2020) ...................................................... 18

*Alexander v. Brigham & Women's Physicians Org., Inc.*,
  467 F. Supp. 2d 136 (D. Mass. 2006), *aff'd*, 513 F.3d 37 (1st Cir. 2008) ................................ 6

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009) ........................................................................... 5

*Bafford v. Admin. Comm. of Northrop Grumman Pension Plan*,
  101 F.4th 641 (9th Cir. 2024) .................................................................. 5

*Bakri v. Venture Mfg. Co.*,
  473 F.3d 677 (6th Cir. 2007) .................................................................. 8

*Beverly Oaks Physicians Surgical Ctr., LLC v. Blue Cross & Blue Shield of Illinois*,
  983 F.3d 435 (9th Cir. 2020) .................................................. 15, 19, 20, 21, 22

*Caldwell v. Musk*,
  No. 24-CV-02022-MMC, 2024 WL 4654272 (N.D. Cal. Nov. 1, 2024) ................... 14, 15, 16

*Callan v. Merrill Lynch & Co*,
  No. 09 CV 0566 BEN (BGS), 2010 WL 3452371 (S.D. Cal. Aug. 30, 2010) ................... 8, 13

*Cigna Corp. v. Amara*,
  563 U.S. 421 (2011) ................................................................... *passim*

*Colburn v. Hickory Springs Mfg. Co.*,
  448 F. Supp. 3d 512 (E.D.N.C. 2020) ......................................................... 8, 13

*Collazo v. Infonet Servs. Corp.*,
  No. CV-13-02206-PSG(AGRX), 2015 WL 13917163 (C.D. Cal. Apr. 8, 2015) .............. 8, 13

*Curtiss-Wright v. Schoonejongen*,
  514 U.S. 73 (1995) ........................................................................... 13

*Delaye v. Agripac, Inc.*,
  39 F.3d 235 (9th Cir. 1994) ............................................................... 11, 12

*Demery v. ExteBank Deferred Comp. Plan (B)*,
  216 F.3d 283 (2d Cir. 2000) ................................................................... 12

Frankfurt Kurnit Klein + Selz PC

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS THE COMPLAINT'S SECOND
CAUSE OF ACTION

*Depot, Inc. v. Caring for Montanans, Inc.*,
915 F.3d 643 (9th Cir. 2019).................................................................................. 16

*Donovan v. Bierwirth*,
680 F.2d 263 (2d Cir. 1982).................................................................................. 10

*Duggan v. Hobbs*,
99 F.3d 307 (9th Cir. 1996)................................................................... 10, 11, 12

*Greany v. Western Farm Bureau Life Ins. Co.*,
973 F.2d 812 (9th Cir. 1992).................................................................................. 21

*Fort Halifax Packing Co. v. Coyne*,
482 U.S. 1 (1987)................................................................................. 11, 12

*Gabriel v. Alaska Elec. Pension Fund*,
773 F.3d (9th Cir. 2014)............................................................. 19, 20, 21

*Gilliam v. Nevada Power Co.*,
488 F.3d 1189 (9th Cir. 2007)....................................................... 6, 7, 8, 9

*Howard v. Shay*,
100 F.3d 1484 (9th Cir. 1996)............................................................................ 10

*In re IT Group, Inc.*,
448 F.3d 661 (3d Cir. 2006)................................................................................ 10

*Khoja v. Orexigen Therapeutics, Inc.*,
899 F.3d 988 (9th Cir. 2018)....................................................................... 5, 18

*Korman v. ILWU-PMA Claims Office*,
2019 WL 3033529 (C.D. Cal. July 3, 2019) ......................................................... 18

*Kurisu v. Svenhard Swedish Bakery Supplemental Key Mgmt. Ret. Plan*,
No. 20-cv-06409-EMC, 2021 WL 3271252 (N.D. Cal. July 30, 2021).................................. 15

*United States ex rel. Lee v. SmithKline Beecham, Inc.*,
*245 F.3d 1048 (9th Cir. 2001)* ......................................................................... 17

*Mertens v. Hewitt Assocs.*,
508 U.S. 248 (1993) ................................................................................ 20

*Moyle v. Liberty Mut. Ret. Ben. Plan*,
823 F.3d 948 (9th Cir. 2018) ............................................................................. 18

*In re New Valley Corp.*,
89 F.3d 143 (3d Cir. 1996)............................................................................. 7

*Pane v. RCA Corp.*,
868 F.2d 631 (3d Cir. 1989)............................................................................ 10

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS THE COMPLAINT'S SECOND
CAUSE OF ACTION

Frankfurt Kurnit Klein + Selz PC

*In re Rigel Pharms., Inc. Sec. Litig.*,
    697 F.3d 869 (9th Cir. 2012) ................................................................................ 5

*Schuman v. Microchip Tech. Inc.*,
    302 F. Supp. 3d 1101 (N.D. Cal. 2018) ............................................................... 18

*Wise v. Verizon Communications, Inc.*,
    600 F.3d 1180 (9th Cir. 2010) .............................................................................. 18

*Zavala v. Kruse-W. Inc.*,
    2021 WL 5883125 (E.D. Cal. Dec. 13, 2021) ................................................ 16, 17

**Statutes**

29 U.S.C. § 1002 ......................................................................................................... 2, 6

ERISA § 201, 29 U.S.C. § 1051 ..................................................................................... 7

ERISA § 204 ................................................................................................................... 18

ERISA § 301, 29 U.S.C. § 1081 ............................................................................... 7, 13

ERISA § 401, 29 U.S.C. § 1101 ................................................................................. 7, 9

ERISA § 502, 29 U.S.C. § 1132 ............................................................................ *passim*

ERISA § 510 ........................................................................................................... *passim*

ERISA § 514, 29 U.S.C. § 1144 ..................................................................................... 7

Internal Revenue Code Section 409A ............................................................................. 9

**Rules & Other Authorities**

*Black's Law Dictionary* 383 (9th ed. 2010) ................................................................. 10

Fed. R. Civ. P. 12 ............................................................................................................ 5

Fed. R. Civ. P. 15 .......................................................................................................... 22

"Top Hat Plan Statement," available at
    https://www.dol.gov/agencies/ebsa/employers-and-advisers/plan-
    administration-and-compliance/reporting-and-filing/e-file/tophat-plan-filing-
    instructions ......................................................................................................... 7

Frankfurt Kurnit Klein + Selz PC

Frankfurt Kurmit Klein+Selz PC

# MEMORANDUM OF POINTS AND AUTHORITIES

## I.    INTRODUCTION

This is a straightforward case of a vengeful and powerful CEO abusing the ERISA process and legal system in an attempt to prevent Plaintiffs, a group of C-level former Twitter executives, from receiving benefits under the company's change in control severance plan. Here, Plaintiffs relied on their severance plan benefits in remaining with the company through a tumultuous acquisition, which was the very intent of the plan, as confirmed by Twitter in proxy statements. In much the same way that Defendants compiled after-the-fact and changing explanations to try to justify Mr. Musk's unfounded preemptive characterization of Plaintiffs' terminations as being for "Cause" in order to deny them benefits under the plan, Defendants now boldly attempt to recharacterize what type of plan is at issue in this case, and the ERISA[1] fiduciary obligations owed thereunder, in an effort to convince the Court to dismiss Plaintiffs' ERISA § 510 claim and surcharge remedy, despite the plain language of the plan directly contradicting Defendants' assertions.

In particular, Defendants try to convince this Court that the plan at issue - an employee welfare benefit plan providing severance benefits with immediate payment obligations – is somehow actually a "top hat" plan – a category that by law is limited to a narrow slice of ERISA pension benefit plans that provide deferred compensation. Defendants' sole purpose in making this argument is to try to skirt ERISA fiduciary obligations, which are the highest known under the law, and to preclude certain ERISA remedies available to rectify harm caused by a breaching fiduciary, including surcharge, since top hat plans are exempt from ERISA fiduciary requirements. But the plain language of the plan directly contradicts Defendants' assertions, stating in no uncertain terms that the administrator of the plan is the "named fiduciary" of the plan and "will be subject to the fiduciary standards of ERISA." Likewise, on its face the plan document confirms that it is a "welfare benefit plan" that is designed to provide severance, payable as a lump sum, in order to protect Twitter executives "if their employment is negatively affected by a change of

---

[1] The Employee Retirement Income Security Act of 1974, 29 U.S.C. § 1001 et seq., as amended.

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS THE COMPLAINT'S SECOND
CAUSE OF ACTION

1  control of Twitter" – and thus is not a top hat pension plan providing deferred compensation.

2  Furthermore, the cases cited by Defendants for their top hat plan argument actually demonstrate

3  why this is a welfare plan providing for a lump sum of severance benefits, and not a top hat

4  pension plan providing deferred compensation. The Court should reject Defendants' attempts to

5  rewrite the plan in order to skirt the law, and their concomitant argument that the remedy of

6  surcharge is unavailable.

7       With respect to other equitable remedies for restitution and disgorgement sought by

8  Plaintiffs with their Section 510 claim and targeted by Defendants based on arguments that

9  prevailed before Judge Chesney, Plaintiffs have alleged different and specific facts that would

10  allow this Court to find differently based on the existence of particular property or specific funds –

11  other than their vested shares – that are not paid from Defendants' general assets. For these

12  reasons, Defendants' Motion to Dismiss (ECF No. 28, or "Motion") should be denied, or in the

13  alternative, dismissal should be without prejudice and with leave for Plaintiffs to replead.

14  **II.    STATEMENT OF RELEVANT FACTS**

15       **A.    Pertinent Terms of the Plan and Plaintiffs' Participation Agreements**

16       The Twitter, Inc. Change of Control and Involuntary Termination Protection Policy dated

17  August 8, 2014 (the "Plan"), by its own terms, states that it is "designed to provide certain

18  protections to a select group of key [Twitter] employees if their employment is negatively affected

19  by a change of control of Twitter" and is "designed to be an 'employee welfare benefit plan' as

20  defined in Section 3(1) of [ERISA]."  ECF 1-1, at p. 2 of 11; *see* 29 U.S.C. § 1002(1). As Twitter

21  stated in a proxy statement in May 2022, the company offered this welfare benefit plan because it

22  believed that "to properly motivate and incentivize our executive team in the event of a change of

23  control and to the possibility of a termination without 'cause' or a termination with 'good reason,'

24  a standardized 'double trigger' change of control and severance policy is critical. Each NEO

25  [named executive officer] that remains employed with us participates in our Severance Policy,

26  which provides standardized payments and benefits to the NEOs in the event of a termination

27  without 'cause' by us or termination for 'good reason' by the participant, whether or not in

28  connection with a change of control, to make these benefits consistent among the executives who

Frankfurt Kurnit Klein+Selz ₚₖ

2

Case No. 24-cv-06266-JSC

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS THE COMPLAINT'S SECOND
CAUSE OF ACTION

have these arrangements." ECF 1 ¶ 129.

Plaintiffs were designated as employees eligible to participate in the Plan, and formalized this through their respective Participation Agreements. *Id.* at ¶¶ 26, 33, 38; ECF 1-1, 1-2, 1-3 (Plan document and participation agreement for each Plaintiff). The "Change of Control Severance Benefits" provided by the Plan include a cash severance paid as a "lump sum" on the sixty-first day following a Qualified Termination, COBRA premiums to cover a specified period of time, and immediate acceleration of equity vesting. ECF 1 ¶ 40; ECF 1-1 at pp. 2-3 of 11. Payment of Plan benefits is contingent on a specified set of events, including an "Involuntary Termination" during a "Change of Control Period." ECF 1-1, at p. 2 of 11. The Plan defines an Involuntary Termination to include a termination by the participating employee for "Good Reason" or a termination by Twitter other than for death, disability, or "Cause" (*id.* at p. 5 of 11), and "Good Reason" includes "a material adverse change" in the nature or scope of the participant's "authority, powers, functions, duties, responsibilities, or reporting relationship (including ceasing to directly report to the chief executive officer or board of directors of a publicly traded entity, as applicable)" (*id* at p. 4 of 11).

Finally, the Plan states that "[t]he Administrator is the 'named fiduciary' of the Policy for purposes of ERISA and will be subject to the fiduciary standards of ERISA when acting in such capacity." ECF 1-1 at p. 6 of 11. Likewise, a claim denial letter to each Plaintiff, in discussing the "Relevant Plan Provisions," reconfirmed that the Plan's "Administrator" is "the 'named fiduciary' of the Policy for purposes of ERISA and will be subject to the fiduciary standards of ERISA when acting in such capacity." *See* Declaration of Kirsten Scott in Support of Plaintiffs' Request for Incorporation by Reference and Request for Judicial Notice in Support of Opposition to Defendants' Motion to Dismiss ("K. Scott Decl."), Exh. A at p. 7, Exh. B at p. 7, Exh. C at p. 7.

**B.      Elon Musk's Takeover of Twitter Results in Plaintiffs' Involuntary Termination During a Change of Control Period**

After rapidly acquiring significant amounts of Twitter stock, Mr. Musk offered to purchase Twitter at $54.20 per share, a 38% premium over the stock's closing price on the day before he disclosed his 9% ownership stake in the company. ECF 1 ¶ 54. The Twitter Board accepted Mr.

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS THE COMPLAINT'S SECOND CAUSE OF ACTION

Musk's offer, and signed the Merger Agreement on April 25, 2022. *Id.* ¶ 58. Less than two weeks later, Mr. Musk began attempting to back out of the deal, prompting months of intense litigation. *Id.* ¶¶ 59-61. This period was marked by uncertainty within the Company, as reflected in the stock price. *Id.* Plaintiffs were among the executives who worked diligently to continue operating the company in a manner consistent with the Merger Agreement and their obligations to the Twitter Board and shareholders and to ease the eventual transition. *Id.* Mr. Musk finally agreed to honor the terms of the Merger Agreement, and the deal closed on October 27, 2022. *Id.*

The acquisition provided "Good Reason" within the meaning of the Plan for Plaintiffs to terminate their employment with Twitter during a Change of Control Period, because they no longer reported to the CEO or Board of a publicly traded company. *Id.* ¶¶ 64-66. Mr. Musk was well aware that once the acquisition closed, several executives would be entitled to severance benefits under the Plan, and he rushed to shut certain top executives out of their email access and terminated them before they completed the 30-day notice periods for their "Good Reason" resignations. *Id.* ¶ 62. Mr. Musk was careful to specify that the terminations were "for Cause" within the meaning of the Plan, ensuring that the Plan's claim process would result in his desired determination that Plaintiffs were not entitled to benefits. *Id.* ¶ 84.

### C.    Mr. Musk and Twitter Retaliate Against Plaintiffs for Their Good Reason Resignations

On October 28, 2022 Plaintiffs each tendered their resignations for "Good Reason" under the Plan and offered to remain employed for the 30-day notice period in order to smooth the transition of their responsibilities. *Id.* ¶¶ 66-68, 158. On October 31, 2022, Twitter abruptly shut each of the Plaintiffs out of the office and all systems, access to which was necessary for their cooperation in the purported internal investigation and the transition. On November 2, 2022, Twitter confirmed via emails that each Plaintiff remained a Twitter employee until November 27, 2022. *Id.* ¶¶ 74-75.

In spite of the assurances that they remained employed and the purported expectation that Plaintiffs cooperate with transitioning their duties and any investigations, from October 31, 2022 on, Plaintiffs were locked out of the Twitter office and accounts, Twitter did not pay their salary or

Frankfurt Kurnit Klein+Selz PC

benefits, and Twitter failed to pay their November 1, 2022 equity vest. *Id.* ¶¶ 77. Defendants' failure to pay Plaintiffs' salary, benefits, and equity vest, were retaliation for Plaintiffs exercising their rights under the Plan. *Id.* ¶ 161.

### D.     Mr. Musk Terminated Plaintiffs to Interfere With Their Severance Benefits

Hours before the expiration of the notice period, on Sunday, November 27, 2022, Mr. Musk sent each Plaintiff a notice terminating their employment and informing them that he had predetermined that they would be ineligible for Plan benefits because the terminations were for "Cause." *Id.* ¶ 84. Mr. Musk's unilateral decision to terminate Plaintiffs, citing the "Cause" definition under the Plan, formed the basis for the eventual denial of their claims for their benefits under the Plan and appeals of Defendants' claim denials. Mr. Musk's decision, at the eleventh hour before Plaintiffs completed the notice period set by Twitter, to try to terminate them for Cause, was designed to interfere with their rights to their severance benefits under the Plan. *See id.* ¶ 165.

## III.    ARGUMENT

### A.     Legal Standard

On a motion to dismiss for failure to state a claim pursuant to Fed. R. Civ. P. 12(b)(6), the Court must "accept the factual allegations of the complaint as true and construe them in the light most favorable to the plaintiff." *Bafford v. Admin. Comm. of Northrop Grumman Pension Plan*, 101 F.4th 641, 648 (9th Cir. 2024). Defendants may not "present their own version of the facts at the pleading stage." *Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988, 999 (9th Cir. 2018). The motion should be denied if the complaint contains "sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face;' that is, plaintiff must 'plead[ ] factual content that allows the court to draw the reasonable inference that the defendant is liable[.]'" *Id.* at 1008 (internal citations omitted); *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).

Review of a motion to dismiss is "generally limited to the face of the complaint," but a court may consider "materials incorporated into the complaint by reference, and matters of which [it] may take judicial notice." *In re Rigel Pharms., Inc. Sec. Litig.*, 697 F.3d 869, 875-76 (9th Cir.

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS THE COMPLAINT'S SECOND CAUSE OF ACTION

2012). Plaintiffs' accompanying request for incorporation by reference and request for judicial notice ask the Court to consider both types of materials.

**B.      The Plan Is Not a Top Hat Plan, and Surcharge Is an Available Remedy on Plaintiffs' ERISA § 510 Claim.**

Defendants first seek to argue that the ERISA 510 claim should be dismissed because the Plan is an ERISA "top hat" plan and thus exempt from ERISA's fiduciary provisions that provide the basis for the surcharge remedy.

ERISA "top hat" plans are a narrow subset of pension plans, and the Plan at issue in this case is not a pension plan, nor does it meet the specific criteria that a pension plan must meet to constitute a top hat plan. Instead, the Plan is a welfare benefit plan. This conclusion rests not only on the law and the facts as pled by Plaintiffs, but also on the language of the Plan itself. Accordingly, Defendants are wrong in arguing that the Plan is exempt from ERISA's fiduciary requirements, or equitable relief available to remedy a breaching fiduciary's conduct, including surcharge. In fact, both the Plan and the claim denial letters state that the Plan is subject to ERISA fiduciary duties. ECF 1-1 at p. 6 of 11; Exhs. A (p. 7), B (p. 7) and C (p. 7) to K. Scott Decl. Furthermore, the burden is on Defendants to show that the Plan is a top hat plan, which they cannot do. *See Alexander v. Brigham & Women's Physicians Org., Inc.*, 467 F. Supp. 2d 136, 142 (D. Mass. 2006), *aff'd*, 513 F.3d 37 (1st Cir. 2008). Thus, Defendants' contention that surcharge is unavailable as a remedy on the sole basis that the Plan is a top hat plan fails.

1.      Top Hat Plans Are a Subset of ERISA Pension Plans

An ERISA top hat plan is a specific, and narrow, type of pension plan. ERISA divides employee benefit plans into two broad categories: pension (or retirement) plans, and welfare plans. 29 U.S.C. § 1002(1), (2); *see Gilliam v. Nevada Power Co.*, 488 F.3d 1189, 1193 n.5 (9th Cir. 2007). The difference between the two is "the nature of the benefit furnished – a pension plan provides retirement income or other deferred income, while a welfare plan provides benefits upon the occurrence of various specified contingencies." *Gilliam*, 488 F.3d at 1193 n.5. (quoting 1 ERISA Practice & Procedure § 2:5, 2–16 to –17 (Clark Boardman Callaghan 2d ed. 2005)). As the Ninth Circuit has articulated, "[t]op hat plans represent a special category of ERISA pension

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS THE COMPLAINT'S SECOND CAUSE OF ACTION

Frankfurt Kurmit Klein+Selz pc

benefit plans." *Id.* (internal quotation and citation omitted). Likewise, the United States Department of Labor, Employee Benefits Security Administration ("EBSA"), which administers and enforces Title I of ERISA, confirms that "[t]op hat plans are unfunded or insured pension plans" for a select group of management or highly compensated employees. EBSA website, "Top Hat Plan Statement," available at https://www.dol.gov/agencies/ebsa/employers-and-advisers/plan-administration-and-compliance/reporting-and-filing/e-file/tophat-plan-filing-instructions.

If a plan is a pension plan, it can constitute a top hat plan only if it is "unfunded and [] maintained by an employer primarily for the purpose of providing deferred compensation for a select group of management or highly compensated employees." *Gilliam*, 488 F.3d at 1192-93 (*quoting* ERISA §§ 201(2), 301(a)(3), 401(a)(1), 29 U.S.C. §§ 1051(2), 1081(a)(3), 1101(a)(1)). "The elements of this definition make the top hat category a narrow one," and thus "top hat plans form a rare sub-species of ERISA plans." *In re New Valley Corp.*, 89 F.3d 143, 148 (3d Cir. 1996).

Although top hat plans are subject to ERISA preemption and limitations on remedies, they are exempt from certain ERISA requirements imposed on other pension plans, including minimum participation and vesting standards and funding requirements, as well as from ERISA's fiduciary standards. ERISA §§ 201(2) (participation and vesting), 301(a)(3) (funding), 401(a)(1) (fiduciary responsibilities), 29 U.S.C. §§ 1051(2), 1081(a)(3), 1101(a)(1); see ERISA §§ 502 (civil enforcement), 514 (preemption of state laws), 29 U.S.C. §§ 1132, 1144. But the very fact that top hat plans are exempt from funding, participation and vesting requirements further confirms that top hat plans are a type of pension plan, because these ERISA requirements do not even apply to welfare benefit plans to begin with. *See* ERISA §§ 201(1), 301(a)(1), 29 U.S.C. §§ 1051(1), 1081(a)(1); cf. ERISA § 401(a), 29 U.S.C. § 1101(a) (fiduciary requirements generally applicable to welfare plans and pension plans, although not top hat pension plans).

/ / /

/ / /

/ / /

2.    The Plain Language of the Plan Demonstrates That It Is a Welfare Plan

Designed to Protect Participants in the Event of a Company Change in

Control

The plain language of the Plan demonstrates that it is – and was intended to be – a welfare

plan, and not a top hat pension plan. The "actual language of the plan" is an important factor for a

court to consider in determining what type of plan is at issue. *See Bakri v. Venture Mfg. Co.*, 473

F.3d 677, 678 (6th Cir. 2007). In fact, multiple cases relied upon by Defendants confirm the

importance of the "plain language" stated in the plan when a court is determining the type and

purpose of the plan. *See Collazo v. Infonet Servs. Corp.*, No. CV-13-02206-PSG(AGRX), 2015

WL 13917163, at *1 (C.D. Cal. Apr. 8, 2015) (rejecting claim on a motion to dismiss that the plan

at issue was something other than a retirement plan, where the plan itself "clearly states that the

purpose of the plan is to 'provide pension benefits'"); *Colburn v. Hickory Springs Mfg. Co.*, 448 F.

Supp. 3d 512, 523 (E.D.N.C. 2020) (in analyzing top hat plan status, "[o]f particular importance

was the plan's express terms."); *Callan v. Merrill Lynch & Co*, No. 09 CV 0566 BEN (BGS),

2010 WL 3452371, at *12 (S.D. Cal. Aug. 30, 2010) (court considered language in plan document

in determining what type of plan it was).

Here, on its face, the Plan states unequivocally that it is "designed to be an 'employee

welfare benefit plan'" under ERISA, and that its aim is "to provide certain protections to a select

group of key Twitter, Inc.…employees if their employment is negatively affected by a change of

control of Twitter." ECF 1-1 (Exhibit A to Complaint), at p. 2 of 11. Thus, in addition to explicitly

saying that it is a welfare (and not a pension) plan, the Plan's stated purpose fits squarely within

the Ninth Circuit's description of welfare benefit plans: it provides benefits upon the occurrence of

specified contingencies. *See Gilliam*, 488 F.3d at 1193, n.5. Specifically, severance benefits are

owed under the Plan if there is a Change of Control at Twitter, and if the participant experiences

an Involuntary Termination (including quitting for Good Cause) within twelve months, as those

terms are defined in the Plan. ECF 1-1 at pp. 2-5 of 11. [2]

_____

[2] Furthermore, Twitter never filed a Top Hat Plan registration statement with the Department of

Frankfurt Kurmit Klein+Selz PC

1    Defendants' assertion that the Plan language "explicitly states" that it provides deferred

2    compensation is erroneous and misleading. *See* Motion to Dismiss at p. 7. Instead, the reference to

3    deferred compensation in the Plan is nothing more than boilerplate language regarding Internal

4    Revenue Code Section 409A, which addresses deferral of taxation on compensation that otherwise

5    would be subject to immediate taxation. Specifically, the Plan says "[t]he Company intends that

6    all payments and benefits provided under this Policy or otherwise are exempt from, or comply

7    with, the requirements of Section 409A," and any payments a person receives – from the Plan or

8    otherwise – that are considered deferred compensation under Section 409A, "if any," will be paid

9    in compliance with Section 409A. ECF 1-1 at p. 5 of 11 (emphasis added). But all this language

10   does is say that the plan sponsor is aware of Section 409A, and that it intends to comply with this

11   law to ensure that if benefits under the plan are characterized by the IRS as deferred

12   compensation, they will not be taxable to the employee in the year of deferral but rather when they

13   are received. The language does not actually characterize the payment of Plan benefits as being

14   subject to Section 409A, or as being deferred compensation. To the contrary, it is obvious from the

15   Plan terms that participants deferred nothing; prior to the contingent events occurring (Change of

16   Control, and Involuntary Termination within twelve months), a participant has no immediate right

17   to receive the amounts provided by the Plan, and so are not at risk of immediate taxation. In any

18   event, whether a particular payment is found to be subject to Section 409A is a separate inquiry

19   from whether a plan is designed "primarily for the purpose of providing deferred compensation"

20   for purposes of determining whether it constitutes a top hat pension plan. *See Gilliam*, 488 F.3d at

21   1192-93.

22       Furthermore, the plain language of the Plan document confirms that the Compensation

23   Committee of the Twitter Board "is the 'named fiduciary' of the Policy for purposes of ERISA

24   and will be subject to the fiduciary standards of ERISA when acting in such capacity." ECF 1-1 at

25   p. 6 of 11. But as discussed above, top hat plans are exempt from fiduciary rules. ERISA §

26   _____

27   Labor, again showing that the Plan is not – and was never intended to be - a top hat plan. *See*
     Plaintiffs' Request for Incorporation by Reference and Request for Judicial Notice in Support of
28   Opposition to Defendants' Motion to Dismiss; *see also* K. Scott Decl., ¶ 5.

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS THE COMPLAINT'S SECOND
CAUSE OF ACTION

Frankfurt Kurmit Klein+Selz rc

401(a)(1), 29 U.S.C. § 1101(a)(1) (exempting top hat plans from fiduciary responsibilities); *Pane v. RCA Corp.*, 868 F.2d 631, 637 (3d Cir. 1989) (top hat plans "are not managed by fiduciaries and involve no fiduciary obligations of plan administrators toward plan participation"). The fact that Twitter specified a named fiduciary in the Plan document, and confirmed that it is subject to ERISA fiduciary standards, further confirms that Twitter never intended it to be a top hat plan. Moreover, Defendants should not be permitted to renege, years later, on Twitter's promise to participants, as set forth in the Plan document, and again in the claim denial letters sent to Plaintiffs, that the Plan would be administered by an ERISA fiduciary, someone who is subject to the highest duties known to the law (*Howard v. Shay*, 100 F.3d 1484, 1488 (9th Cir. 1996)), and who is required to make decisions "with an eye single to the interests of the participants" (*Donovan v. Bierwirth*, 680 F.2d 263, 271 (2d Cir. 1982)).

For all of these reasons, the plain language of the Plan confirms that the Plan is a welfare benefit plan, and not a top hat pension plan.

### 3. The Purpose of the Plan Is Not to Provide for Deferred Compensation

The Plan also is not a top hat plan because its purpose is not to provide for deferred compensation, which is required for top hat plan status. *See Duggan v. Hobbs*, 99 F.3d 307, 310 (9th Cir. 1996). "A deferred compensation plan 'is an agreement by the employer to pay compensation to employees at a future date. The main purpose of the plan is to defer the payment of taxes.' The idea is to defer the receipt of compensation until retirement or termination of employment, when the employee is in a lower tax bracket, thus reducing the overall amount of taxes paid." *In re IT Group, Inc.*, 448 F.3d 661, 664 (3d Cir. 2006) (*quoting* David J. Cartano, Taxation of Compensation & Benefits §§ 20.01 & 20.02[A] at 709-710 (2004)); *see also Black's Law Dictionary* 383 (9th ed. 2010) (defining "defer" as "to postpone" or "to delay"). But here, as alleged in the Complaint and as set forth in the Plan, the severance benefits only become payable under the Plan if certain contingencies are met: a Change of Control, and an Involuntary Termination within twelve months. ECF 1-1 at pp. 2-5 of 11. There was no agreement between Plaintiffs and Twitter to defer receipt of compensation owed to Plaintiffs until a future date, and nor could there be under this Plan, because the benefits were not owed or payable unless the

1  contingencies occurred. Then, if the contingencies did occur, the benefits became payable

2  immediately, as a lump sum. Again, there is no deferral of any kind.

3  　　　Defendants' reliance on *Duggan* for the proposition that "severance benefits like those

4  provided under the Plan are routinely considered deferred compensation" (*see* ECF 28 at 7) is

5  disingenuous and flies in the face of mandatory authority. In *Fort Halifax Packing Co. v. Coyne*,

6  482 U.S. 1 (1987), the Supreme Court recognized that the category of ERISA welfare benefit

7  plans includes plans that pay severance benefits. *Id*. at 7, n.5. Likewise, in *Delaye v. Agripac, Inc.*,

8  39 F.3d 235 (9th Cir. 1994), the Ninth Circuit confirmed that "[p]rovisions for severance pay may

9  constitute an employee welfare benefit plan within the meaning of ERISA." *Id*. at 237.

10  　　　Furthermore, the facts in *Duggan* are readily distinguishable from this case. In *Duggan*, the

11  Court held that a severance agreement provided for deferred compensation, and constituted an

12  ERISA-governed top-hat pension plan, based on the specific facts of the case, including that

13  although the employee could have sought a lump sum payment of the severance, he instead

14  negotiated for the employer to "provide him with lifelong retirement benefits" in the form of

15  monthly payments payable until his death. *Duggan*, 99 F.3d at 309, 310. That arrangement made

16  the benefit a pension benefit, and its purpose was to defer or delay the receipt of compensation

17  until a later date, which provides the individual with a tax advantage, instead of receiving a lump

18  sum payment. Here, in stark contrast, the Plan provides for an immediate lump sum payment of

19  benefits if the Change in Control and Involuntary Termination provisions are met, and does not

20  provide for any deferral of compensation. *See* ECF 1-1 at 2 of 11 ("Upon a Qualified Termination,

21  you will be eligible to receive a lump-sum severance payment.").

22  　　　Furthermore, in *Duggan*, in considering what constitutes "deferred compensation" for

23  purposes of evaluating top hat plan status, the Ninth Circuit looked to Department of Treasury

24  regulations promulgated under the Internal Revenue Code for guidance, and concluded that

25  "compensation is deferred when it is received by the employee significantly after the services are

26  rendered." 99 F.3d at 311-12 (*citing* Temporary Treas. Reg. § 1.404(b)–1T). In *Duggan*, that is

27  exactly what happened: the employee negotiated to spread out payment for years after services

28  were rendered, and thus a finding of top hat plan status was appropriate. 99 F.3d at 309, 310. In

Case No. 24-cv-06266-JSC

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS THE COMPLAINT'S SECOND
CAUSE OF ACTION

Frankfurt Kurmit Klein+Selz PC

stark contrast, here, the Plan provides for an immediate lump sum of severance upon the Change in Control and Involuntary Termination provisions being met, without any deferral of compensation. ECF 1-1 at 2 of 11.

Other than asserting, in conclusory fashion, that the Plan in this case is a deferred compensation plan like the one in *Duggan*, Defendants articulate no reason why the severance benefits provided under this Plan should be construed as deferred compensation. Instead, Defendants' position seems to be that all severance plans or agreements must constitute deferred compensation. But this cannot be, and this position is unsupported by the Supreme Court and Ninth Circuit law, as discussed above. *See Fort Halifax Packing Co.*, 482 U.S. at 7, n.5; *Delaye*, 39 F.3d at 237.

In fact, in *Ditchey v. Mechanics Bank*, this Court addressed a change in control severance plan indistinguishable from the one at issue here, where benefits under the plan included (a) severance pay equal to 200% of the employee's compensation, (b) a prorated short-term incentive award, (c) reimbursement of COBRA premiums, (d) complete vesting of certain benefits, and (e) executive outplacement services, and determined that the plan was an ERISA-governed employee welfare benefit plan (and thus, not a top hat pension plan that provided for deferred compensation). 2016 WL 730290, Case No. 15-cv-04103-JSC, at *3 (N.D. Cal., Feb. 24, 2016) (citing *Delaye*, among other authorities). As in *Ditchey*, the Plan here provides for benefits that include: (a) a lump sum of cash severance equal to one year of the employee's base salary, (b) payment of one year of COBRA premiums, and (c) accelerated vesting of equity. Complaint at ¶¶ 40, 44-46; ECFs 1-1, 1-2, 1-3. Defendants do not, and cannot, articulate any reasonable basis for why the Plan here is a top hat pension plan whose purpose is to provide for deferred compensation, even though the plan at issue in *Ditchey* was a welfare benefit plan.

Furthermore, other cases relied upon by Defendants for their top hat plan argument are also readily distinguishable, because, unlike here, they involved plans that the parties agreed provided deferred compensation. *See Demery v. Extebank Deferred Comp. Plan (B)*, 216 F.3d 283, 285 (2d Cir. 2000) (undisputed that plan "allowed participants to defer up to 25% of their salary as contributions to the Plan," with benefits payable upon reaching retirement age, and at issue was

1   whether the plan was funded or unfunded); *Collazo*, 2015 WL 13917163, at *1 (undisputed that a

2   supplemental executive retirement plan provided pension benefits, and at issue was whether retiree

3   medical benefits provided under the same plan were also subject to top hat plan rules); *Colburn*,

4   448 F. Supp. 3d at 518-19 523-28 (undisputed that a plan was a supplemental executive retirement

5   plan intended to provide retirement income to specified employees, and at issue were questions

6   regarding the plan's funding and covered employees). Unlike those cases, the Plan at issue here

7   does not provide deferred compensation, or any other form of retirement benefits. Thus, those

8   cases do not demonstrate that a top hat pension plan is at issue in this case.

9       Defendants also cite *Callan*, 2010 WL 3452371, in support of their top hat pension plan

10   argument. But the court in *Callan* confirmed that in order to be a top hat plan, the plan at issue

11   "must possess a retirement purpose and systematically provide for deferred income." *Id*. at *8. But

12   the Plan here has no retirement purpose, and does not systematically provide for the deferral of

13   any income. Thus, *Callan* further demonstrates why the Plan here is not a top hat plan.

4.   The Fact That the Plan Is Unfunded, and the Participants Are Executives, Does Not Demonstrate That The Plan Is a Top Hat Pension Plan

16      Defendants contend the fact that the Plan is unfunded is evidence that the Plan is a top hat

17   plan. But this straw man is easily toppled. The Plan is not funded because it is a welfare benefit

18   plan, and ERISA does not require welfare benefit plans to be funded. *See* ERISA § 301(a)(1), 29

19   U.S.C. § 1081(a)(1); *Curtiss-Wright v. Schoonejongen*, 514 U.S. 73, 79 (1995) ("Nor does ERISA

20   establish any minimum participation, vesting, or funding requirements for welfare plans as it does

21   for pension plans.").

22      Likewise, the fact that the Plan was, according to Defendants, only offered to a select

23   group of management or highly compensated Twitter employees does not make it a top hat plan.

24   Instead, as stated in Twitter's May 2022 proxy statement, offering the Plan to key Twitter

25   executives was a strategy implemented by Twitter in order to retain key executives leading up to,

26   and through, a potential merger or other change in control event. ECF 1 at ¶ 129. Thus,

27   Defendants' argument that offering the Plan only to a select set of key executives makes it a top

28   hat plan designed for the purpose of providing deferred income also fails.

Frankfurt Kurnit Klein + Selz PC

5.    <u>Surcharge Is an Available Remedy for Plaintiffs' ERISA Section 510 Claim</u>

Defendants' only argument as to why they contend a surcharge remedy is not available for Plaintiffs' ERISA section 510 claim is because they contend the Plan is a top hat plan. Because that argument fails for the reasons discussed above, Defendants' motion to dismiss Plaintiffs' claim seeking surcharge must be rejected.

Furthermore, as the Court is aware, several other Twitter executives have brought similar cases against Defendants, also alleging Section 510 claims. The court recently denied Defendants' motions to dismiss the Section 510 claims and the associated surcharge remedy in those cases, as the Court should do here. *See Agrawal v. Musk*, No. 24-cv-01304-MMC, 2024 WL 4654442, at *4 (N.D. Cal. Nov. 1, 2024); *Caldwell v. Musk*, No. 24-CV-02022-MMC, 2024 WL 4654272, at *5 (N.D. Cal. Nov. 1, 2024).  As Judge Chesney recognized, "[a] plaintiff asserting a violation of § 510 may 'bring a civil action (A) to enjoin any violative act or practice, or (B) to obtain other appropriate equitable relief.'" *Agrawal*, 2024 WL 4654442, at *3 (*quoting Spinelli v. Gaughan*, 12 F.3d 853, 856 (9th Cir. 1993) (internal quotation marks, alterations, and citation omitted). "A 'surcharge' is 'exclusively equitable' and is imposed to remedy 'a breach of trust committed by [a] fiduciary encompassing any violation of a duty imposed upon that fiduciary.'" *Id*. at *5 (*quoting Cigna Corp. v. Amara*, 563 U.S. 421, 442 (2011)). "Where an ERISA fiduciary has breached a fiduciary duty, he can be required to 'return' to the beneficiary any 'benefit' the fiduciary gains by the breach or, alternatively, to pay 'damages' to the beneficiary for 'actual harm,' i.e., the amount necessary to 'put the beneficiary in the position he or she would have attained but for the trustee's breach.'" *Id*. (*quoting Skinner v. Northrop Grumman Retirement Plan*, 673 F.3d 1162, 1167 (9th Cir. 2012)).

Here, Plaintiffs seek surcharge as a form of relief to remedy Defendants Musk and X Corp.'s retaliation against Plaintiffs for exercising their rights under the Plan to provide notice of Good Reason for resigning, including, among other things, by purporting to preemptively terminate Plaintiffs' employment – and pre-determine their anticipated claims for Plan benefits -- on the last day of the notice-and-cure period, and by failing to pay Plaintiffs' salary and equity payable during the notice-and-cure period. ECF 1 at ¶ 161, Prayer for Relief at ¶ 4.

For all of these reasons, Plaintiffs have sufficiently pled their entitlement to surcharge. In addition, although Plaintiffs believe the Court can, and should, reject Defendants' contention that this Plan is a top hat plan in totality, at most the Court could find that "there is a factual question as to whether the written Plan constitutes a top hat plan, and thus dismissal of the claim for equitable relief at this time is not appropriate." *See Kurisu v. Svenhard Swedish Bakery Supplemental Key Mgmt. Ret. Plan*, No. 20-cv-06409-EMC, 2021 WL 3271252, at *10 (N.D. Cal. July 30, 2021).

**C.     Plaintiffs Have Sufficiently Alleged Bases for Additional Forms of Equitable Relief**

Because Plaintiffs have adequately alleged entitlement to surcharge, the Court need not reach Defendants' arguments regarding other available equitable relief. *See Beverly Oaks Physicians Surgical Ctr., LLC v. Blue Cross & Blue Shield of Illinois*, 983 F.3d 435, 442 (9th Cir. 2020) (where plaintiffs sufficiently alleged waiver in support of claim for benefits, that was sufficient for claim to proceed without court considering entitlement to estoppel). "Indeed, a maxim of equity states that '[e]quity suffers not a right to be without a remedy.'" *Cigna Corp. v. Amara*, 563 U.S. 421, 440 (2011) (quoting R. Francis, Maxims of Equity 29 (1st Am. ed. 1823)). Here, relying primarily on cases decided on summary judgment, Defendants seek to foreclose the Court from awarding an equitable remedy, even though Plaintiffs' rights have not yet been established.

However, in the event the Court chooses to reach Plaintiffs' non-surcharge remedies, Plaintiffs have sufficiently alleged—at the pleading stage—entitlement to appropriate equitable relief under ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3), to redress Defendants' violation of Section 510 and that restitution, disgorgement, equitable lien, and estoppel are appropriate equitable remedies to redress violations of Plaintiffs' rights under ERISA. Furthermore, Plaintiffs' Section 510 claim is distinguishable from the *Agrawal* and *Caldwell* cases, and thus Judge Chesney's decisions on those forms of relief are inapplicable.

/ / /

/ / /

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS THE COMPLAINT'S SECOND
CAUSE OF ACTION

1                1.     <u>Plaintiffs Have Properly Pled Facts to Support Claims for Restitution and</u>

2                      <u>Disgorgement to Remedy Defendants' ERISA Section 510 Violations.</u>

ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3), permits a plan participant to bring a suit to obtain appropriate equitable relief to enforce the provisions of Title I of ERISA, including ERISA § 510. Restitution and disgorgement are forms of equitable relief available under § 502(a)(3) where they target property in Defendants' possession. *Depot, Inc. v. Caring for Montanans, Inc.*, 915 F.3d 643, 661-65 (9th Cir. 2019); *Zavala v. Kruse-W. Inc.*, 2021 WL 5883125, at *6-7 (E.D. Cal. Dec. 13, 2021). In *Depot*, the Ninth Circuit set forth three methods by which a plaintiff could allege that the money or property sought is in the possession of defendants and therefore state a claim for such relief under § 1132(a)(3). First, a plaintiff may "identif[y] a specific fund to which they are entitled." *Id.* at 662. Second, a complaint may allege "the existence of a general account in which the ill-gotten funds ... were commingled, such that the product of those funds would be traceable." *Id.* at 663. And third, a plaintiff may allege that defendants' account balance remained above the surcharge amounts for purposes of the "lowest intermediate balance" theory. Restitution targets "property identified as belonging . . . to the plaintiff" while disgorgement targets "the 'proceeds' from disposing of [such] property as well as 'profits derived' from the illicit use of that property." *Id.* at 661, 664.

While the Court in *Caldwell* rejected the argument that the plaintiffs' specific shares of equity – those that the Plan mandated were to vest upon a Change of Control -- were "held" by the Defendants and thus constituted particular property, this Court may reach a different decision.  In addition, this case is distinguishable because the Plaintiffs in the instant case allege that Defendants hold property that can be clearly traced to particular funds or property in Mr. Musk's and Twitter's possession.  Specifically, Plaintiffs allege that Defendants "failed to pay Plaintiffs' salaries and to make associated 401(k) matching contributions during the notice and cure period" and "fail[ed] to pay Plaintiff's equity vest due November 1, 2022."  ECF 1, ¶¶ 161-164. Unlike the shares subject to accelerated vesting under the Plan upon a Change of Control event, which Judge Chesney found were "an unsecured obligation of the Company, payable (if at all) only from the general assets of the Company," *Caldwell* at 7 & n.3, Plaintiffs here have alleged their entitlement

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS THE COMPLAINT'S SECOND
CAUSE OF ACTION

Frankfurt Kurnit Klein+Selz pc

to a different category of payments that are traceable to a specific fund. In particular, Plaintiffs

have alleged that all then-current Twitter employees, except Plaintiffs, received payment for an

equity vest on November 1, 2022. They further allege that they were abruptly shut out of the office

on October 31, 2022, while being advised that they remained employed. ECF 1, ¶¶ 75-77

("Twitter also failed to pay each Plaintiff the salary and benefits they received as employees,

including but not limited to payment of each Plaintiff's November 1, 2022 vesting of equity,

which upon information and belief was paid provided to all employees other than Plaintiffs. . . ).

Given the timing at issue, the Complaint supports an inference that such payments had been set

aside and scheduled for payment to specific individuals. Plaintiffs should be provided with the

opportunity to engage in discovery toward that end, or in the alternative, to amend their Complaint

to allege these specific facts. *See United States ex rel. Lee v. SmithKline Beecham, Inc.,* 245 F.3d

1048, 1052 (9th Cir. 2001) (quoting Lopez v. Smith, 203 F.3d 1122 (9th Cir. 2000) ("[L]eave to

amend should be granted unless the district court 'determines that the pleading could not possibly

be cured by the allegation of other facts.'"); *see also Zavala*, 2021 WL 5883125, at *7 ("As this

court previously noted, the following information is likely to be unavailable to plaintiff in the

absence of discovery: the identity of a specific fund, whether particular assets were commingled in

a general account, and whether defendants' account balances remained above a specific dollar

amount.").

> 2. Plaintiffs Also Have Adequately Pled Facts to Support Their Entitlement to Equitable Estoppel.

Likewise, Plaintiffs also have alleged sufficient facts to support equitable estoppel as a

remedy for Defendants' violation of ERISA § 510, which, as discussed above, is remedied by

appropriate equitable relief under ERISA § 502(a)(3).

Estoppel is an appropriate equitable remedy for statutory violations—not solely for

misrepresentations, as Defendants incorrectly suggest. *See Amara*, 563 U.S. at 424, 441 (holding

estoppel was an available remedy where Plaintiffs proved violations including failure to provide

the notice required by ERISA § 204(h)).[3] Moreover, Plaintiffs have pled multiple

misrepresentations by Defendants regarding their ongoing employment during November 2022

and their entitlement to Plan benefits that Defendants should be estopped to deny. Contrary to

Defendants' mischaracterization of the Complaint, the Complaint states that Twitter represented to

Plaintiffs that they *would be provided* their severance benefits under the Plan,. ECF 1 ¶ 79. The

Court must accept as true this allegation *as stated* and may not credit Defendants' rewritten

version of this fact on a motion to dismiss[4]. *See Khoja*, 899 F.3d at 999.

In addition, there are also other misrepresentations alleged in the Complaint and on which

Defendants intended Plaintiffs to rely. For example, Twitter repeatedly represented that Plaintiffs

continued to be employed between October 28 and November 27, 2022 (ECF ¶¶ 72, 75, 108, 159),

and that Twitter "was *in the process of providing salary and benefits* and was *also* preparing

separation agreements." ECF 1 ¶ 79 (emphasis added). The Complaint alleges Defendants are

estopped from now contending that Plaintiffs were not employed during the notice period, and that

they are not entitled to their salary and equity benefits during that time (*id*. ¶167), though the

---

[3] At this stage, Plaintiffs are entitled to seek both benefits under the terms of the Plan and estoppel to deny their entitlement to those benefits as a remedy for the § 510 violations. *See Moyle v. Liberty Mut. Ret. Ben. Plan*, 823 F.3d 948, 961 (9th Cir. 2018). After *Amara*, claims for benefits and for equitable relief "may proceed simultaneously so long as there is no double recovery." *Id.; accord, Schuman v. Microchip Tech. Inc.*, 302 F. Supp. 3d 1101, 1117 (N.D. Cal. 2018) (holding plaintiffs sufficiently alleged facts supporting estopping defendants from disputing plaintiffs' entitlement to severance benefits); *see also Akhlaghi v. Cigna Corp.*, 2020 WL 6260012, *7 (N.D. Cal. July 27, 2020) ("Post-*Moyle*, courts in this district routinely refuse to dismiss Section 1132(a)(3) claims based on duplicity at the motion to dismiss stage.") (collecting cases). Defendants' reliance on the pre-*Amara* decision in *Wise v. Verizon Communications, Inc.*, 600 F.3d 1180, 1190 (9th Cir. 2010), is misplaced.

[4] Defendants cite to *Korman v. ILWU-PMA Claims Office*, 2019 WL 3033529, at *4 (C.D. Cal. July 3, 2019), for the proposition that a "directive to pay in a pre-authorization letter was at most an acknowledgement of the individual's participation in the plan, not a guarantee of benefits sufficient to induce reasonable reliance." That case is distinguishable on its facts where the letter at issue specifically subjected benefits to "your eligibility at the time  you receive the medical services." *Id*. at *3. Plaintiffs' Complaint, in contrast, does not allege any similar reservation of rights or additional conditions of eligibility. Rather, it alleges that Twitter "would provide Plaintiffs with their severance agreements once Twitter had completed its interview and phone collection" and that such interview and collection could be scheduled "after the [Thanksgiving] holiday if you and your clients prefer." ECF ¶ 82.

Frankfurt Kurnit Klein+Selz PC

1   Motion fails to address these allegations in the Complaint. Defendants also ignore Plaintiffs'

2   allegation that Twitter, through its outside counsel, stated that it would provide Plaintiffs with

3   their separation agreements—part of the process of obtaining Plan benefits—"once Twitter had

4   completed its interview and phone collection" and that the interview times could be scheduled

5   "after the [Thanksgiving] holiday." ECF 1 ¶¶ 83, 84.

6        The remedy of equitable estoppel holds the fiduciary "to what it had promised" and

7   "operates to place the person entitled to its benefit in the same position he would have been in had

8   the representations been true." *Amara*, 563 U.S. at 441. Although some older cases discuss

9   estoppel as a standalone claim for relief involving additional pleading requirements, such a claim

10  is no longer recognized in the Ninth Circuit after *Amara. Gabriel v. Alaska Elec. Pension Fund*,

11  773 F.3d at 956 n.4 (9th Cir. 2014).

12       Here, Plaintiffs sufficiently plead the elements of estoppel: (1) Defendants knew the facts;

13  (2) Defendants intended that their conduct would be acted on or so acted that Plaintiffs had a right

14  to believe Defendants so intended; (3) Plaintiffs were ignorant of the true facts; and (4) Plaintiffs

15  relied on Defendants' conduct to their injury. *Beverly Oaks*, 983 F.3d at 442; *see* J. Eaton,

16  Handbook of Equity Jurisprudence § 62, p. 150 (1923); 3 S. Symons, Pomeroy's Equity

17  Jurisprudence § 805, pp. 191-92 (5th ed.1941) (both cited in *Amara*, 563 U.S. at 441). After

18  Plaintiffs tendered their Good Reason notices, Defendants told them that (1) they would continue

19  to remain employed until November 27, 2024, (2) no one accused them of any wrongdoing, (3)

20  they would be provided their separation agreements entitling them to severance benefits under the

21  Plan once they participated in the requested internal investigation interviews, and (4) the requested

22  interviews could take place after November 27, 2022, following the holiday weekend.  ECF 1 ¶¶

23  83-85. Plaintiffs had no knowledge that these statements were false. But just in time to cut short

24  the notice period, Mr. Musk terminated Plaintiffs, citing the Plan definition of "Cause" including

25  their "failure to cooperate in good faith with a[n internal] investigation of the Company or its

26  directors, officers or employees, if the Company has requested your cooperation." *Id.* ¶ 86.

27       These allegations, and the reasonable inferences contained in the allegations and the

28  quoted Plan language, support every element required to assert equitable estoppel as an equitable

19                                      Case No. 24-cv-06266-JSC

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS THE COMPLAINT'S SECOND
CAUSE OF ACTION

Frankfurt Kurnit Klein + Selz pc

remedy. *First*, it is plausible that Twitter and its counsel knew about the grounds for Cause defined in the Plan, including subsection (g) for failure to cooperate with an internal investigation at the Company's request. The Complaint also alleges that Mr. Musk instructed human resources to terminate Plaintiffs effective October 31, 2022 and not to pay them, knowing it was treating them as discharged. *Second*, Plaintiffs had a basis for believing that Twitter intended to provide their severance benefits after Plaintiffs participated in the interview and collection at a time after the end of the notice period and in a manner that they were continuing to negotiate. Defendants' repeated assurances also gave Plaintiffs a basis to believe they continued to be employees until November 27 and would be compensated accordingly. *See Beverly Oaks*, 983 F.3d at 442 (holding that Plaintiff "had a basis for believing that Blue Cross intended to provide benefits for the claimed procedures"). *Third*, Plaintiffs were unaware that their participation in the interview and collection had to occur before the end of their notice period or that their failure to do so before that time would constitute "Cause" for termination and render them ineligible to receive their severance benefits under the Plan. Plaintiffs were also unaware at the time that they were already terminated and would not be entitled to their salary or November 1 equity vest. *Fourth*, Plaintiffs relied on Twitter's representation that they could do the interviews and phone collections after November 27, 2022 and that they would be provided with their separation agreements afterwards, to their severe detriment. Plaintiffs also relied on Defendants' representations that they were still employed in agreeing to participate in those interviews and subject their personal phones to an unprecedented and invasive probe. Accordingly, the Complaint alleges the elements of an equitable estoppel remedy on more than one basis.

The Supreme Court has made clear that the remedies under ERISA § 502(a)(3) are those that were typically available in equity in the days of the divided bench, as described in traditional equity treatises like Eaton and Pomeroy. *Mertens v. Hewitt Assocs.*, 508 U.S. 248, 256 (1993); *Amara*, 563 U.S. at 439. Nonetheless, Defendants argue that additional criteria applicable to a standalone claim for "ERISA estoppel" also apply to the remedy under § 502(a)(3).[5] But even if

---

[5] In *Gabriel v. Alaska Elec. Pension Fund*, 773 F.3d 945 (9th Cir. 2014), the Ninth Circuit did

Case No. 24-cv-06266-JSC

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS THE COMPLAINT'S SECOND
CAUSE OF ACTION

they apply, those additional criteria are also met. Plaintiffs have adequately pleaded extraordinary circumstances. Allegations that can constitute "extraordinary circumstances" includes "making 'a promise that the defendant reasonably should have expected to induce action or forbearance on the plaintiff's part,' as well as "conduct suggesting that [the employer] sought to profit at the expense of its employees," a "showing of repeated misrepresentations over time," or evidence "that plaintiffs are particularly vulnerable." *Gabriel*, 773 F.3d at 957.

Here, the Complaint and the reasonable inferences therefrom plausibly allege that Twitter promised Plaintiffs could participate in the investigation after their notice period, and that Twitter reasonably expected Plaintiffs would rely on this statement and wait until after the Thanksgiving holiday weekend to schedule and attend the interviews, which Plaintiffs did. The Complaint also plausibly alleges that Plaintiffs reasonably relied on Twitter's assurances that Plaintiffs were still employed during their notice period in agreeing to make themselves available for an interview and phone collection and to assist with the transition of their duties. These representations were also repeated over time, and suggest that Mr. Musk sought to profit at Plaintiffs' expense by inducing them to assist his internal investigation while intending the whole time to deny them tens of millions of dollars in severance benefits.

Furthermore, the Plan language relied upon by Defendants defines "Cause" as "(g) failure to cooperate in good faith with a governmental or internal investigation of the Company or its directors, officers or employees" (ECF 1-1). This language is silent on the timing of an Eligible Employee's cooperation with a company investigation in order to meet the "good faith" criteria, or whether it can be satisfied after their notice period ends. In view of this, Twitter's later insistence

_____

refer to the "additional requirements" for "equitable estoppel in the ERISA context" that apply to a freestanding estoppel claim. *Gabriel*, 773 F.3d at 955; *see Greany v. Western Farm Bureau Life Ins. Co.*, 973 F.2d 812, 821-22 (9th Cir. 1992) (pre-Amara decision discussing requirements for federal common-law claim of equitable estoppel). But the *Gabriel* discussion is dicta, both because (1) *Gabriel* acknowledges that there is no "independent cause of action" for "equitable estoppel in the ERISA context," *id.* at 956 n.4, 957, and (2) the *Gabriel* plaintiff could not satisfy the traditional requirements for an estoppel remedy because he knew he was ineligible for benefits. *Id.* at 950. *Beverly Oaks* also refers to additional requirements in the ERISA context, but the decision deals with estoppel as a theory of relief on a claim under ERISA § 502(a)(1)(B), not 502(a)(3) as in *Amara* and this case. *Beverly Oaks*, 983 F.3d at 442.

Case No. 24-cv-06266-JSC

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS THE COMPLAINT'S SECOND CAUSE OF ACTION

Frankfurt Kurnit Klein + Selz ᴘᴄ

that Plaintiffs' failure to cooperate in good faith with the investigation is an interpretation of "good faith" and "cooperate" that constitutes an interpretation, not a modification of the Plan. The ERISA-specific elements for equitable estoppel are thus also met. *See Beverly Oaks*, 983 F.3d at 442-43.

## IV.    CONCLUSION

For the foregoing reasons, the Court should deny Defendants' Motion to Dismiss. In the alternative, if the Court grants any part of the Motion, Plaintiffs request leave to amend under Federal Rule of Civil Procedure 15.

DATED:  December 17, 2024

Respectfully submitted,
RENAKER SCOTT LLP


By:    _____*/s/ Kirsten Scott*_____
Kirsten Scott
Teresa S. Renaker


FRANKFURT KURNIT KLEIN + SELZ PC
Wendy Stryker (admitted *pro hac vice* )
Kristen Niven (admitted *pro hac vice* )

*Attorneys for Plaintiffs*

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS THE COMPLAINT'S SECOND
CAUSE OF ACTION